RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FATOS VASHA,

*Petitioner,*

No. 03-3592

*v.*

ALBERTO GONZALES, Attorney General,

*Respondent.*

---

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A76 972 577.

Argued: October 12, 2004

Decided and Filed: June 14, 2005

Before: MOORE and SUTTON, Circuit Judges; ADAMS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Marisa Petrella, PETRELLA & ASSOCIATES, P.C., Southfield, Michigan, for Petitioner. Thankful T. Vanderstar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Marisa Petrella, PETRELLA & ASSOCIATES, P.C., Southfield, Michigan, for Petitioner. Thankful T. Vanderstar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

MOORE, J., delivered the opinion of the court except as to Part II-B. SUTTON, J. (pp. 12-13), joined the opinion of the court but delivered a separate opinion with respect to Part II-B. ADAMS, D. J., concurred in the judgment only.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioner, Fatos Vasha ("Vasha"), seeks review of a final order of the Board of Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") denying his request for asylum and withholding of removal under the Immigration and Nationality Act ("INA"). The BIA affirmed the IJ's finding that Vasha was incredible and that he had failed to demonstrate a well-founded fear of future persecution. In his

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

1

petition for review, Vasha argues that (1) the BIA's opinion upholding the IJ's decision was not supported by the evidence; (2) his due process rights were violated by the manner in which the IJ conducted the removal hearing; and (3) the BIA improperly applied its streamlining regulation to the case. Upon review, we conclude that the decision to deny Vasha's asylum claim was supported by substantial evidence and that the BIA did not err in designating this case for review by a single BIA member. Furthermore, though we find the IJ's actions in this case particularly troubling, the procedural errors ultimately did not prejudice Vasha's case. Therefore, Vasha's petition for review is **DENIED**.

## I. BACKGROUND

Vasha is a thirty-three-year-old native and citizen of Albania. He was born and raised in Mamurras, Albania, which is located in the northern part of the country. Vasha testified that his family has a long history of political persecution under the former communist regime. Several members of his family, including his grandfather, fled from Albania to the United States in 1947. As a result, the family members who remained in Albania were branded as traitors and forced to live in an internment camp. Vasha testified that once he became older, he joined the anti-communist movement and participated in protests against the communist regime. Vasha continued his protests against the socialist government, which was elected in 1997 and which he claims is comprised of the same people who were in power in the communist government. At his removal hearing, Vasha testified to five specific incidents which occurred during either the communist or socialist eras, in support of his asylum and withholding of removal claims.

On July 9, 1990, at the age of eighteen, Vasha, along with a large group of anti-communist protestors, tried to flee Albania by traveling to Tirana, the capital of the country, to seek asylum at the various foreign embassies located there. Vasha testified that the police stopped the large crowd of people at the entrance to Tirana, and arrested him. At his removal hearing, he testified that the police grabbed him by the hair, shouted profanities at him, and threw him in a police car, which transported him back to Mamurras. Vasha claimed that the Mamurras police held him for seventy-two hours, during which he was interrogated and tortured. Specifically, Vasha testified that the police "beat me pretty badly. They beat me with plastic rods . . . with wet rope, and they stuck needles underneath my nails." Joint Appendix ("J.A.") at 322 (Removal Hr'g Tr. at 29). According to Vasha, he was released after seventy-two hours, because the police did not have any evidence to charge him with a crime. He explained that following his release, his mother attempted to treat his wounds with homeopathic drugs, aspirin, and tea, but eventually he was taken to the medical center for treatment of his injuries.

On December 10, 1990, Vasha traveled with his cousins and friends to Tirana to support a hunger strike by pro-democracy students protesting the communist government. Vasha testified that he participated in the demonstration by shouting anti-communist slogans. On December 13, 1990, Vasha returned to Mamurras, where he was arrested by the police, taken to the police station, and placed in a very small room. He testified that the police kicked, punched, and beat him for thirty minutes with plastic rods and wet rope. He claimed that the police told him that "[w]e have had [communism] for 45 years and we are not going to let it go." J.A. at 317 (Removal Hr'g Tr. at 24). According to Vasha, his relatives had discovered he was being held at the police station and protested outside of it demanding his release. The police decided to release him after forty-eight hours, but to "discredit [him] in the eyes of the Mammuras [sic] people." J.A. at 318 (Removal Hr'g Tr. at 25). He testified that he was taken to the medical center for treatment of his injuries.

On February 13, 1991, Vasha and his friends participated in another student protest against the communist government in Tirana. The protestors pulled down a statue of Enver Hoxha, the communist ruler of Albania. Vasha participated in the protest by shouting anti-communist slogans four to five hours a day for seven consecutive days. Vasha testified that as the demonstrators

marched to the city center, fire trucks sprayed them with a solution which stained their clothes a specific color. Vasha claimed that after the demonstration, he and his friends were stopped by the police outside of Tirana. Recognizing that they were protestors by their stained clothing, the police handcuffed them and dragged them by their hair to the police station. At the station, Vasha was kicked, punched, and beaten with a plastic rod for more than six hours. Vasha testified that he was beaten to the point of unconsciousness, but the police poured cold water on him to revive him. He explained that the police eventually released him to make room for additional protestors in the police station, and that he walked home.

After the collapse of the communist government and the election of the Democratic Party in 1992, Vasha experienced a "quiet period" where he was able to attend college. J.A. at 342 (Removal Hr'g Tr. at 49). He became a member of the Association of Formerly Politically Persecuted Persons as well as a political party known as Balli Kombetar. His duties in the latter included recruiting new members and working with party candidates in the 1996 and 1997 elections. Vasha claimed that following the election of the Socialist Party in June 1997, he was fired from his job for political reasons. On October 15, 1997, Vasha participated in a protest against the socialist government's practice of firing governmental employees because of their political affiliation. Vasha attended the demonstration as a representative of Balli Kombetar and spoke at the event. The following morning police officers arrested Vasha at his home, handcuffed him, and took him to the police station. After Vasha admitted that he had participated in the demonstration, the police beat him with plastic rods and a wooden chair leg. He claimed he was beaten approximately six times over a two-day period.

On September 15, 1998, Vasha participated in an anti-government demonstration to protest the assassination of Azem Harjdari, a Democratic Party leader. Vasha testified that he held up a sign during the demonstration which stated "Az[e]m, You Are Alive," a reference to protestors' claim that their cause would continue despite Harjdari's death. J.A. at 351 (Removal Hr'g Tr. at 58). Vasha testified that at the demonstration, sharpshooters shot and killed a member of Balli Kombetar, who was standing a few feet away from Vasha. A few days later, a friend came to Vasha's home and told him that the police had placed his name on a "blacklist." J.A. at 353 (Removal Hr'g Tr. at 60). The friend advised Vasha to leave the country immediately or else risk being arrested or killed. On September 18, 1998, two officers from the investigative division arrived at Vasha's home looking for him, but he was in hiding.

Vasha testified that soon afterwards he sold one of his houses and used the proceeds to pay smugglers to bring him to the United States. On October 10, 1998, he and his cousin entered the United States in Chicago using false documents and traveled to Michigan. Later, his wife entered the United States illegally and joined him. Vasha and his wife have a daughter, who was born in Royal Oak, Michigan, and is a United States citizen. Though he does not have a job, Vasha supports his family by performing household chores for his U.S. relatives, who in turn permit the family to live with them.

On March 1, 1999, the Immigration and Naturalization Service ("INS") served Vasha with a Notice to Appear, charging him with being present in the United States without being admitted or paroled, in violation of § 212(a)(6)(A)(i) of the INA, 8 U.S.C. § 1182(a)(6)(A)(i). On April 5, 1999, Vasha filed an application for asylum and withholding of removal. At the removal hearing, Vasha conceded his unlawful status, but asserted he was eligible for asylum and withholding of removal because he would be imprisoned or killed if he were ever to return to Albania. Dr. Darren Fischer ("Dr. Fischer"), an associate professor at Indiana University, testified as an expert witness on Vasha's behalf, and stated that Mamurras is "something of a wild west region" where "the government has very little control," "[t]he police tend to be ineffectual," and "[t]he courts tend to be corrupted." J.A. at 410 (Removal Hr'g Tr. at 117). He explained that "real power tends to rest with a series of Albanian, and probably now, regional Mafias." J.A. at 410 (Removal Hr'g Tr. at

117). Dr. Fischer also testified that there was "long-standing hostility" between the Socialist Party and Balli Kombetar. J.A. at 412 (Removal Hr'g Tr. at 119).

Following the close of all the evidence and the opportunity for closing arguments, the IJ, Elizabeth A. Hacker, recessed the proceeding to "formulate a decision." J.A. at 419 (Removal Hr'g Tr. at 126). After the recess, the IJ returned and stated on the record that through discussions with the court clerk, who is of Albanian descent, the IJ learned that Vasha had a relationship with Ekrem Bardaj ("Bardaj"), a prominent member of the local Albanian community.[1] The IJ stated that she questioned Vasha off the record about the relationship, and discovered that Bardaj was Vasha's second cousin, with whom he was living. Furthermore, the IJ learned from her clerk that the president of Albania was visiting the Detroit area the next month and Bardaj was one of the sponsors of the trip. The IJ concluded that:

> The Court's intention at this point, since I am aware, by the Court's Clerk, who is currently on vacation, by virtue of our discussions, who is also a member of the Albanian community, that the [Albanian president] is coming and I'm aware of who is sponsoring it. Unless the parties have reason to dispute what I've said, I've no intention of continuing. I'm prepared to enter an order now.

J.A. at 422 (Removal Hr'g Tr. at 129). At this point, Vasha's counsel suggested that the evidence be placed on the record. The IJ responded that "in order to satisfy both sides . . . I will ensure that before I issue my decision in this case, I will get the record. And the decision will I then enter forthwith. I will allow no further submission of evidence." J.A. at 423 (Removal Hr'g Tr. at 130). The IJ cautioned, however, that "given the relationship and given the fact that this is the same cousin who has been supporting this respondent, as we have learned in our discussions . . . there's a strong likelihood that I may make a finding which is adverse." J.A. at 424 (Removal Hr'g Tr. at 131).

The IJ then recessed the proceeding and signed a subpoena for Bardaj to appear for a removal hearing for Vasha's cousin, which was scheduled the same day as Vasha's next hearing. On November 4, 1999, Vasha's removal hearing was reconvened and the Government called Bardaj to testify. Bardaj testified that Vasha lived in his house for some period of time and that Bardaj served as one of the hosts when the Albanian president visited the United States. On August 7, 2001, the IJ issued a written order denying Vasha's request for asylum and withholding of removal. The IJ found Vasha to be incredible based on several inconsistencies and implausibilities in his testimony as well as the absence of any corroboration. Furthermore, the IJ found that Vasha failed to demonstrate a well-founded fear of future persecution in light of the fact that his cousin, Bardaj, had a significant relationship with the current Albanian president. In addition to ordering his removal, the IJ also entered a Frivolous Finding Order against Vasha. On March 27, 2003, pursuant to 8 C.F.R. § 1003.1(e)(5), a single member of the BIA affirmed the IJ's decision, with the exception of the Frivolous Finding Order. Vasha now petitions this court for review of the denial of his asylum and withholding of removal claims.

## II. ANALYSIS

### A. Adverse Credibility Determination

Vasha argues in his petition that the BIA erred in upholding the IJ's adverse credibility conclusion. We have stated that "[c]redibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under that standard, findings of fact are treated as "'conclusive unless any reasonable

---

[1] The name of this witness is spelled a variety of ways in the record. We adopt the name as spelled in the IJ's written decision. *See* J.A. at 36 (IJ Written Order at 12).

adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). Applying this deferential standard to Vasha's case, we conclude that the IJ's credibility finding was supported by the evidence, and therefore, the record does not compel a contrary result.

Under the INA, the Attorney General may grant asylum to an alien who qualifies as a "refugee," which is defined as one "who is unable or unwilling to return to . . . [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal quotation omitted). The applicant need not demonstrate that he will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

In this case, the BIA adopted the reasoning of the IJ, who denied Vasha's asylum application "primarily due to [his] lack of credibility and corroboration." J.A. at 45 (IJ Written Order at 21). We have stated that though "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency." *Sylla*, 388 F.3d at 926 (internal quotation and citations omitted). Moreover, "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Shire v. Ashcroft*, 388 F.3d 1288, 1296 (9th Cir. 2004) (internal quotation omitted). Where the credibility determination is based on inconsistencies unsupported in the record, we have reversed the determination. *Sylla*, 388 F.3d at 930; *see also Ileana v. INS*, No. 02-3972, 2004 WL 1770569, at *2 (6th Cir. Aug. 5, 2004) ("The Court will not accept blindly an IJ's conclusion that a petitioner is not credible."). In this case, though several of the inconsistencies identified by the IJ were unsupported and the implausibilities were based on mere speculation, we conclude that review of the record as a whole does not compel a contrary result.

The IJ noted several inconsistencies to support the adverse credibility determination, which was affirmed by the BIA. Vasha testified that he was arrested on December 13, 1990 because he supported an anti-communist hunger strike a few days earlier. He stated, in his direct examination, that his relatives discovered he was arrested and protested outside of the police station for his release. He claimed that as a result of their protest "the police decided it's better to release me and discredit me in the eyes of Mammuras [sic] people." J.A. at 318 (Removal Hr'g Tr. at 25). Later, on cross-examination, he testified that he was released because, by law, the police must either charge a suspect or release him within seventy-two hours and they had no evidence to charge him with a crime. With regard to his February 1991 arrest, Vasha testified that he was beaten so severely that he was almost unconscious, but later claimed that he walked home. He initially explained that he "came down to the road but there weren't too many private cars because at that time in Albania there weren't many cars." J.A. at 333 (Removal Hr'g Tr. at 40). When questioned by the IJ concerning how he was able to walk home given his injuries, Vasha stated "[w]e got into a car, we didn't walk and that car took us to Mammuras [sic]." J.A. at 393 (Removal Hr'g Tr. at 100). When questioned about how he came to the United States, Vasha testified that after being told that he was on a government blacklist in September 1998, he sold one of his houses to raise money to pay smugglers. He later testified however, that the house had been for sale since June 1998 because his brother was hoping to sell it and use the proceeds to emigrate to Greece. It was also unclear from his testimony which one of his two houses was sold. He testified that one house was occupied by him and his wife

while the other was occupied by his mother and brother. He explained later, however, that he sold the house in which his mother and his wife lived.

When taken together, all of these inconsistencies, which go to the heart of Vasha's asylum claim, support the IJ's conclusion that he is generally not credible. We note in passing, however, that the IJ included several additional inconsistencies, which were unsupported by the record, as well as characterized several facts in Vasha's testimony as implausible based purely on speculation and conjecture.[2] Moreover the IJ erred in insisting that Vasha produce evidence to corroborate his claims.[3] The IJ also incorrectly found that the omission of two of his arrests from his asylum

---

[2] The record does not support the IJ's finding that Vasha was inconsistent in his testimony regarding his arrest for traveling to Tirana to visit foreign embassies in July 1990. *Compare* J.A. at 321-22 (Removal Hr'g Tr. at 28-29) *with* J.A. at 374 (Removal Hr'g Tr. at 81). Vasha was also consistent about the treatment he sought for the wounds resulting from his arrest. J.A. at 324-25 (Removal Hr'g Tr. at 31-32). There is nothing in the record to support the IJ's statement that "[l]ater, [Vasha] testified that he never went to the medical center for treatment." J.A. at 46 (IJ Written Order at 22).

Furthermore, the implausibilities identified by the IJ have no basis in the record, but rather are a result of speculation and conjecture. J.A. at 45, 47 (IJ Written Order at 21, 23). Specifically, the IJ stated that it was "unusual that [Vasha], who was allegedly arrested at the entrance of Tirana, would be transported to a police station in Mamurras, rather than a station located in Tirana." J.A. at 45 (IJ Written Order at 21). Given the fact that Vasha testified that the group of protestors was infiltrated by police informers from Mamurras and that the Tirana police were aware of the group's mission, it is certainly reasonable to believe that the police were prepared for the protestors' arrival in Tirana and had arranged for their immediate transport back to their point of origin. The IJ also found it to be "rather incredulous" that the police would be able to successfully discredit individuals, whom they had physically abused for three days, by parading them around in front of a public crowd, including several pro-democracy supporters. J.A. at 45 (IJ Written Order at 21). The IJ's reasoning is based on the notion that the police would not publicly display individuals whom they had abused. Once again, there is no basis in the record for this conclusion and it is belied by a 1998 State Department Report for Albania which states that "the police often beat suspects in the process of arresting them, and there were reports that the police beat or otherwise mistreated prisoners." J.A. at 265 (State Dep't Rep. at 1104). Moreover, the report states that "major police stations were the sites of the worst abuse of detainees." J.A. at 265 (State Dep't Rep. at 1104). Thus, given that police abuse is widespread in Albania, it is plausible that the police have no shame in parading obviously abused prisoners in public. Furthermore, it is not clear from the record that Vasha's testimony was correctly translated. Vasha testified that he was paraded around to show he "had been treated the same way as [the] people's enemy." J.A. at 318 (Removal Hr'g Tr. at 25). He stated that he "personally believe[s] that this was a kind of pressure to be exercised upon other people, and use me as an example to frighten others not to support the democracy." J.A. at 318 (Removal Hr'g Tr. at 25). Given that what Vasha described in his testimony could be characterized as more akin to an effort to intimidate others rather than to discredit him, evidence of severe abuse bolsters rather than undermines the police's efforts.

Finally, the IJ found it implausible that the Albanian police would spray protestors with ink to stain their clothes as a method of identification. Once again, the IJ's conclusion is unsupported by the record, but instead is simply her speculation regarding police practices in Albania.

[3] Specifically, the IJ noted that Vasha failed to present medical and police records to corroborate his testimony. While "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration," 8 C.F.R. § 1208.13(a), we have upheld the BIA's rule that "where it is reasonable to expect corroborating evidence . . . [t]he absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (internal quotation omitted). We have noted that "supporting documentation must be provided only if it is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers." *Id.* at 382-83 (internal quotation omitted). In this case, the IJ's insistence on corroborating evidence was inappropriate. It was not reasonable to expect Vasha to have police and medical records pertaining to incidents that occurred more than nine years ago when Albania was ruled under a communist regime. Moreover, given the generalized lawlessness and corruption in Albania under the current socialist government coupled with the fact that "[t]he majority of police officers receive little or no training," we cannot say that police records are the type of documentation normally created and accessible to current asylum applicants from Albania. J.A. at 266 (State Dep't Rep. at 1105); *see, e.g., Shire*, 388 F.3d at 1299 (holding that a medical record from a hospital in Kenya is not "easily available" corroborating evidence); *Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) (holding that a certificate of dismissal was not easily available corroborating evidence because it was in China). Therefore, the absence of the records here is insufficient to support the adverse credibility determination.

application further supported the adverse credibility determination.[4]  Though this is a close case, because there was some evidence to support the adverse credibility determination, we conclude the evidentiary record does not compel a contrary result.  Because his testimony is not credible, Vasha has failed to demonstrate past persecution or a well-founded fear of future persecution.  Therefore, we affirm the BIA's decision denying his asylum claim.

## B.  Due Process Claim

Vasha also argues in his petition that his due process rights were violated by the IJ's off-the-record discussions with the court clerk and the inclusion of evidence regarding Vasha's relationship with Bardaj.  Though I find the IJ's actions troubling, Vasha has failed to demonstrate that he was prejudiced by them, and therefore, he should be denied relief on this ground.

We review de novo alleged due process violations in removal hearings. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).  We have stated that "Fifth Amendment guarantees of due process extend to aliens in [removal] proceedings, entitling them to a full and fair hearing.  To constitute fundamental unfairness, however, a defect in the removal proceedings must have been such as might have led to a denial of justice." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (internal quotation and citations omitted).  Thus, "proof of prejudice is necessary to establish a due process violation in an immigration hearing." *Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004).  Therefore, reviewing an alleged due process violation is a two-step inquiry:  first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it.

Though "[t]he IJ is afforded broad discretion to control the manner of interrogation in order to ascertain the truth," *Mikhailevitch*, 146 F.3d at 391 (internal quotation omitted), we have recognized that "[a] neutral judge is one of the most basic due process protections." *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003) (internal quotation omitted); *see also Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005) ("It is undisputed that petitioners in such proceedings

---

[4]In discussing the adverse credibility determination, the IJ noted that Vasha failed to list in his application his arrests in December 1990 and February 1991.  While omissions may form the basis of an adverse credibility determination, they must be substantially related to the asylum claim. *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003); *Aguilera-Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990).  In this case, however, the omissions were incidents which occurred during the communist regime, which support Vasha's claim of past persecution, but shed little light on his fear of future persecution by the current socialist government should he return to Albania.

Moreover, an asylum applicant is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application.  As the Second Circuit stated, "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and . . . holding applicants to such a standard is not only unrealistic but also unfair." *Secaida-Rosales*, 331 F.3d at 308.  The court noted that "the small space on the form itself would hardly indicate to an applicant that the failure to include every detail regarding the basis for asylum could later lead to an adverse credibility finding when the applicant elaborates on them in the course of a deportation hearing." *Id.*; *see also Ileana*, 2004 WL 1770569, at *3 (holding that the asylum application "does not lend itself to a comprehensive accounting of detail after detail," and therefore omissions of specific incidents do not support an adverse credibility determination); *Pop v. INS*, 270 F.3d 527, 531-32 (7th Cir. 2001) ("We hesitate to find that one seeking asylum must state in his or her application every incident of persecution lest the applicant have his or her credibility questioned if the incident is later elicited in direct testimony."); *Aguilera-Cota*, 914 F.2d at 1382 (holding that the omission of two collateral incidents is insufficient to support an adverse credibility determination where "there were *no* contradictions between the information set forth in the application and his testimony").

The purpose of holding a removal hearing is not simply to reiterate the statements made in the asylum application, but rather to allow an alien "to present evidence on the alien's own behalf" including to supplement statements made in the application itself with additional details or incidents. 8 U.S.C. § 1229a(b)(4)(B).  Vasha testified that he did not include the two incidents because he "thought that [he] should mention specific things and then [he would] have an opportunity to tell [his] story." J.A. at 367 (Removal Hr'g Tr. at 74).  Because nothing in the application is inconsistent with Vasha's subsequent testimony of the specific events at his removal hearing, the omissions of the collateral incidents cannot form the basis for an adverse credibility determination.

are entitled to an unbiased arbiter who has not prejudged their claims."). As the BIA itself has stated:

> [An IJ] must be impartial and must not attempt to establish proof to support the position of any party to the controversy; once he does so he becomes an advocate or a participant, thus ceasing to function as an impartial trier of fact, and a hearing so conducted is lacking in the fundamental fairness required by due process.

*Matter of Lam*, 14 I. & N. Dec. 168, 170 (BIA 1972) (internal quotation omitted); *see also Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("As judicial officers, IJs have a responsibility to function as neutral and impartial arbiters and must assiduously refrain from becoming advocates for either party." (internal quotation omitted)). In this case, I conclude that by her actions, the IJ crossed the line from impartial arbiter to government advocate.

In a removal proceeding, the alien has the burden of proof "to establish that he or she is a refugee as defined in [the INA]," 8 C.F.R. § 1208.13(a), while the Government may present evidence challenging the alien's claim. "The determination of the immigration judge shall be based *only on* the evidence produced at the hearing." 8 U.S.C. § 1229a(c)(1)(A) (emphasis added). In this case, both Vasha and the Government had finished their presentations of their respective cases and the IJ recessed the court to "formulate a decision." J.A. at 419 (Removal Hr'g Tr. at 126). At that point, neither party had presented any evidence about Bardaj or his relationship with Vasha. Upon her return, the IJ indicated that she had off-the-record conversations with the court's clerk regarding Bardaj and his role in hosting the Albanian president, as well as a discussion with Vasha concerning his relationship with Bardaj. By relying on evidence that was not produced by the parties at the hearing to reach her decision, the IJ ran directly afoul of the statute and violated Vasha's due process rights.

The due process violation occurred at the moment the IJ abandoned her role as an impartial arbiter and became a zealous advocate, uncovering a witness the Government did not reveal or present. Due process requires that IJs "assiduously refrain from becoming advocates for either party." *Abdulrahman*, 330 F.3d at 596 (internal quotation omitted). The Fifth Amendment's due process guarantee would be eviscerated if a trier of fact, who is supposed to remain impartial, could nevertheless conduct an independent investigation, discover new evidence, and bolster one side of a dispute.

Moreover, the mere fact that Bardaj was eventually called as a government witness in a subsequent hearing does not cure the constitutional infirmity. The record clearly reveals that the IJ made her determination soon after the off-the-record conversation with her clerk. Once she returned, she stated that "I've no intention of continuing. I'm prepared to enter an order now." J.A. at 422 (Removal Hr'g Tr. at 129). When Vasha's counsel requested that the evidence upon which the IJ was relying be placed on the record, the IJ reiterated "I'm prepared to enter an order at this time." J.A. at 423 (Removal Hr'g Tr. at 130). Eventually, she relented, stating "what I will do in order to satisfy both sides is that I will ensure that before I issue my decision in this case, I will get the record." J.A. at 423 (Removal Hr'g Tr. at 130). Thus, the IJ's own statements reveal that Bardaj's testimony several weeks later was a mere formality, serving to confirm her pre-existing views.

Furthermore, the IJ's dispositive, off-the-record conversation was not *with Bardaj*, but *with her clerk*. The clerk never testified on the record about what she discussed with the IJ, nor was the clerk ever subject to cross-examination. Vasha simply does not know what other evidence, if any, the clerk may have presented to the IJ which influenced her decision in this case. It is for these exact reasons that the statute requires the IJ's determination be based "only on the evidence produced at the hearing." 8 U.S.C. § 1229a(c)(1)(A). In addition, even assuming the clerk spoke

to the IJ only regarding matters about which Bardaj later testified, the weight which the IJ attributed to Bardaj's later testimony was undoubtedly aided by her off-the-record conversations with the clerk, which corroborated his statements. Thus, the mere fact that Bardaj subsequently testified did not ensure that Vasha received a full and fair hearing on the merits of his asylum claim.[5]

Having determined that Vasha's due process rights were violated, I must next determine if the constitutional violation resulted in prejudice, "which means that the IJ's conduct potentially [affected] the outcome of the proceedings." *Cano-Merida v. INS*, 311 F.3d 960, 965 (9th Cir. 2002) (internal quotation omitted) (alteration in original). Having concluded above that there is substantial evidence in the record to support the IJ's adverse credibility determination, Vasha's asylum claim fails without reliance on Bardaj's testimony. Thus, I conclude that though the IJ's actions in this matter are quite troubling, Vasha was not prejudiced by them, and therefore he should be denied relief on this ground.

---

[5] The concurrence argues that because we find that Vasha was not prejudiced, we need not decide the constitutional question in this case. In prior cases, however, we have reached questions regarding the fairness of immigration proceedings even where the errors were ultimately determined to be harmless. *See, e.g., Vardhami v. Gonzales*, No. 03-3672, 2005 WL 977073, at *5 (6th Cir. Apr. 28, 2005) (holding that "[t]he exclusion of relevant and properly authenticated documents is error" but not reversible in this case because no prejudice resulted); *Castellano-Chacon v. INS*, 341 F.3d 533, 553 (6th Cir. 2003) (holding that the IJ erred by denying the petitioner the opportunity to make opening and closing statements but that the error was harmless because the petitioner failed to identify any specific prejudice which resulted). The obvious purpose of our reaching these questions in such cases is to provide clear guidance to the immigration judges as to how to conduct future proceedings consistent with constitutional requirements.

The crux of the argument advanced in the concurrence is that given their expertise in the subject matter and their vast experience in handling asylum claims, it is not unusual for IJs to rely on extra-record factual information in reaching a decision. This argument fails to recognize the distinction between an IJ taking administrative notice of commonly known facts or relying on her institutional expertise and extra-record fact finding, which the IJ did in this case.

Several courts of appeals, including ours, have upheld the practice of an IJ or the BIA taking administrative notice of commonly known facts. *See, e.g., Hadad v. Ashcroft*, No. 03-4285, 2005 WL 758237, at *2 (6th Cir. Apr. 4, 2005) (noting that in several unpublished opinions, this court "has approved the practice of administrative notice of 'significant events' and 'commonly acknowledged facts'" and upholding the BIA's notice of regime change in Iraq); *Circu v. Ashcroft*, 389 F.3d 938, 940 (9th Cir. 2004) (holding that "the IJ did not abuse her discretion in taking administrative notice of" a more recent country report); *Medhin v. Ashcroft*, 350 F.3d 685, 690 (7th Cir. 2003) (holding that an IJ "may take administrative notice of changed conditions in the alien's country of origin"); *Llana-Castellon v. INS*, 16 F.3d 1093, 1097 (10th Cir. 1994) (upholding the BIA's notice of elections and a new government in Nicaragua); *McLeod v. INS*, 802 F.2d 89, 94 (3d Cir. 1986) (upholding the IJ's notice of the change in the government of Grenada). *See also* 8 C.F.R. § 1003.1(d)(3)(iv) (permitting the BIA to take "administrative notice of commonly known facts such as current events or the contents of official documents"). As the Tenth Circuit has explained, "administrative notice emanates from the administrative agency's specialized experience in a subject matter area and its consequential ability to take notice of technical or scientific facts that are within the agency's area of expertise. It is also compelled by the repetitive nature of many administrative proceedings." *Llana-Castellon*, 16 F.3d at 1096 (internal quotations omitted). Thus, as the caselaw demonstrates, administrative notice is appropriate only in situations involving commonly known facts (e.g., the communist regime in Albania fell in 1991) or the agency's expertise (e.g., accumulated knowledge of past persecution techniques in Albania).

In this case, by contrast, the IJ relied on off-the-record conversations with her clerk to learn that Vasha was related to Bardaj, who in turn was hosting the Albanian president during a visit to the Detroit area. This extra-record knowledge was neither a commonly known fact nor a result of her expertise or experience in hearing asylum claims. As a result, the IJ improperly relied on evidence that was not presented by the parties in reaching her decision in clear violation of the law. *See* 8 U.S.C. § 1229a(c)(1)(A) ("The determination of the immigration judge shall be based only on the evidence produced at the hearing.").

The concurrence fails to cite any case which upholds the principle that an IJ may conduct her own fact-finding and identify witnesses which the Government has not. The hypothetical situations posed in the concurrence do not dissuade me from the constitutional principle that "[a] neutral judge is one of the most basic due process protections." *Reyes-Melendez*, 342 F.3d at 1006. Inherent in that principle is the notion that in an immigration proceeding, the alien's adversary is the Government; it should not also be the judge.

## C.  Withholding of Removal

In addition to his asylum claim, Vasha also petitions for review of the BIA's denial of his request for withholding of removal under INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). Withholding of removal is required if the alien can demonstrate that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). "An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004).  In order to qualify for withholding of removal, Vasha "must establish that there is a clear probability that he will be subject to persecution if forced to return to [Albania]." *Id.*  To establish a clear probability, the applicant must demonstrate that "it is more likely than not" that he or she will be persecuted upon return.  8 C.F.R. § 1208.16(b)(2).  Because Vasha has failed to establish his eligibility for asylum, "it therefore follows that he cannot satisfy the more stringent standard for withholding of [removal]" as well. *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001).

Therefore, we conclude that the BIA's decision denying Vasha's claim for withholding of removal was supported by substantial evidence.

## D.  BIA Streamlining Procedure

The final issue Vasha raises in his petition for review is that the BIA should have submitted the case for review by a three-member panel pursuant to 8 C.F.R. § 1003.1(e)(6).  Upon review, we conclude that the BIA properly invoked its streamlining procedures, and therefore we deny Vasha relief on this ground.

Pursuant to 8 C.F.R. § 1003.1(e)(6), a case may only be assigned to a three-member panel of the BIA if the case presents one of the following circumstances:

(i)   The need to settle inconsistencies among the rulings of different immigration judges;
(ii)  The need to establish a precedent construing the meaning of laws, regulations, or procedures;
(iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;
(iv)  The need to resolve a case or controversy of major national import;
(v)   The need to review a clearly erroneous factual determination by an immigration judge; or
(vi)  The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).

8 C.F.R. § 1003.1(e)(6).  Vasha asserts that the BIA erred in not submitting the case to a three-member panel because the IJ made a clearly erroneous factual determination.[6]

---

[6]Vasha incorrectly states that his case was affirmed by the BIA without opinion pursuant to 8 C.F.R. § 1003.1(e)(4).  Though the opinion was brief and adopted much of the IJ's reasoning, the BIA did not affirm the case without opinion, but rather a single member decided the case on the merits pursuant to 8 C.F.R. § 1003.1(e)(5).  The IJ's decision was affirmed, but the Frivolous Finding Order was reversed.

Vasha argues in his brief that because the case was not submitted to a three-member panel, he was denied a de novo review of the facts of the case.  Pet'r Reply Br. at 21.  We find that argument to be wholly without merit.  Cases which are reviewed by a single member receive full consideration of the merits.  8 C.F.R. § 1003.1(e)(5).  Moreover, BIA regulations provide de novo review only for questions of law, while the IJ's factual findings are reviewed for clear error.  8 C.F.R. § 1003.1(d)(3)(i)&(ii).  Regardless of whether an appeal is reviewed by a single member or by a three-member panel, the standard of review by which the BIA reviews the substance of the alien's claims is the same.

Whether an alien may challenge the BIA's use of its streamlining procedure pursuant to the Administrative Procedure Act ("APA") remains an open question before this court. *See Denko v. INS*, 351 F.3d 717, 732 (6th Cir. 2003) ("Assuming, without deciding, that judicial review properly is employed to assess whether the BIA correctly designated a case for summary affirmance. . . ."). We note, however, that the Tenth Circuit has recently held that the criteria outlined in § 1003.1(e)(6) to determine whether a three-member panel is required are sufficiently detailed to permit judicial review. *Batalova v. Ashcroft*, 355 F.3d 1246, 1252-53 (10th Cir. 2004). The Government did not argue the point, and we need not resolve the jurisdictional question in this case.

Pursuant to the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Vasha argues that the case should have been reviewed by a three-member panel of the BIA because the IJ made a clearly erroneous factual determination, thereby satisfying § 1003.1(e)(6)(v). As we concluded above, substantial evidence in the record supports the IJ's adverse credibility determination, and therefore Vasha has failed to demonstrate past persecution or a well-founded fear of future persecution should he return to Albania. Moreover, Vasha has failed to demonstrate that he is eligible for withholding of removal as well. Assuming without deciding that judicial review of the BIA's case-management system is appropriate, we conclude that Vasha has failed to demonstrate that the case should have been reviewed by a three-member panel of the BIA.

## III. CONCLUSION

In sum, we conclude that none of arguments presented in the petition are persuasive, and therefore, we **DENY** Vasha's petition for review.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, concurring.  I join Judge Moore in upholding the immigration judge's (IJ's) denial of asylum (Section A) and denial of withholding (Section C), and I join Judge Moore in concluding that any constitutional due process violation did not prejudice Vasha.  But I do not join the concurrence's proposed resolution of the merits of the due process claim.  It is well within our discretion to avoid the constitutional question because all agree that any error did not prejudice Vasha, *see, e.g.*, *Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004) (dismissing petitioner's due process claim for lack of prejudice without reaching the merits), and in my view the due process claim is a difficult one that does not submit to easy resolution or necessarily to the resolution proposed by the concurrence.

Given the nature and volume of immigration hearings and the number of them that arise from the same country, I suspect that it is not unusual for immigration judges to have extra-record factual information about the dispute in front of them:  the countries, their geography, their history, their politics, as well as other more specific knowledge about the case, such as the parties involved in it or certain nationals in the United States and their involvement in a country's political situation.  The information may be commonly known or not commonly known; it may come from another case or some other source; and it may pre-date the case in question or may be obtained during the case.  Under any of these circumstances, it would not seem unusual or necessarily wrong for the IJ to disclose the information to the parties.  The critical point is that the IJ must let the parties know the source of information and give the parties a chance to comment on it, to introduce evidence about it or, if necessary, to seek the recusal of the judge.

In this case, the IJ not only told the parties what she had learned and how she had learned it but also gave them an opportunity to comment about it.  Vasha's attorney did not dispute the facts the IJ had learned, but requested that "something [be] put on the record," JA 423, other than the IJ's own recounting of her conversations with her clerk.  When the case reconvened about six weeks later, the government, with the IJ's permission, called Bardaj as a witness and established that Bardaj was related to Vasha and that Bardaj had hosted and made a public introduction of the current Albanian president when he visited Detroit.  Vasha's attorney then took the opportunity to cross-examine Bardaj fully.

While the manner by which the IJ first obtained this information was unusual and is hardly to be encouraged, it is well to remember what the information suggested—that the petitioner was at best being less than candid about his fears of returning to Albania and at worst committing fraud on the court.  Had the same information been obtained through the same type of channel in a criminal case and had the information shown that a government witness was being less than candid about the defendant's conduct in the case, would we necessarily conclude that a district court judge had acted improperly just by giving the parties an opportunity to comment about the information?  There are countless possibilities here—in terms of how extra-record information may come to the attention of a decisionmaker, how it may bear on a case and what the decisionmaker should do about it (including the possibility of offering to recuse herself).  It is precisely this array of possibilities that makes it unclear to me where the Constitution draws the line and whether it was crossed in this case.

What is clear to me is that the concurrence has not identified a case that parallels this one—which is to say, it has not identified a case in which the IJ obtained information relevant to the dispute, disclosed that information to the parties and gave the parties an opportunity to comment on it, and a court of appeals (or the United States Supreme Court) nonetheless concluded that the

decisionmaker had violated the Due Process Clause. Thus, while I wholeheartedly agree that "petitioners in [immigration] proceedings are entitled to an unbiased arbiter," *supra* at 8 (quoting *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005)), the question remains whether the IJ in this case offended that requirement.

No less importantly, if the problem with the IJ's conduct was that it suggested that she had abandoned her role as a neutral arbiter, the IJ's disclosure gave petitioner ample options to address the issue. He could have asked the judge to recuse herself, which he did not do. *See Noorani v. Smith*, No. 93-35666, 1994 U.S. App. LEXIS 27369, at *13 (9th Cir. Sept. 22, 1994) (rejecting due process claim arising from allegation that IJ was biased because petitioner could have, but did not, file a motion to recuse the IJ). Or he could have attempted to make a record about the clerk's role in the process, so that an appellate court would know (rather than be forced to speculate about) what exactly happened between the judge and her clerk and how it affected the judge's decisionmaking process. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("While . . . we are understandably troubled by some of those comments, in the context of the record as a whole there is insufficient evidence to conclude that the overall proceedings were biased in violation of Abdulrahman's right to due process."); *Kim v. INS*, No. 92-70780, 1994 U.S. App. LEXIS 11224, at *2 (9th Cir. May 4, 1994) (denying due process claim where IJ stated "I find that the Government has sustained its burden. The only thing I'm continuing is for the benefit of the Court to be sure I've got the complete conviction record."); *id.* at *3–4 ("Although . . . it may have been improper for the IJ to comment on the potential outcome before all evidence was presented, it is clear from the record that the IJ gave Kim the opportunity to present evidence and fully considered all evidence presented."); *see also Banks v. Farley*, No. 97-1282, 1998 U.S. App. LEXIS 17648, at *6 (7th Cir. July 29, 1998) ("In the lack of some form of substantiating evidence, we have no way of evaluating the veracity" of a claim that the decisionmaker was biased.); *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1101 (7th Cir. 1992) ("Allegations of judicial bias are very serious and should never be cast without substantiation."); *cf. United States v. Carmichael*, 232 F.3d 510, 518 (6th Cir. 2000) (denying a Sixth Amendment claim based on ex parte communication between government and judge because the criminal defendant, who knew about the communication, failed to object at trial); *id.* ("To now allow the ex parte communications to be objected to after-the-fact is a form of 'sandbagging' that we will not permit in the absence of proof that the content of what was in fact communicated adversely affected Carmichael's substantial rights."). In the absence of pursuing either option, I am hard pressed to understand how Vasha has established a due process violation.

On this record, I would prefer to explain the risks associated with the IJ's conduct, explain that the use of extra-record information implicates due process, note that the existence of a constitutional violation is not necessary to resolving this dispute and save for another day the resolution of this question.