**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0531n.06

**No. 11-3358**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***May 22, 2012***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| FRIERI MISAEL JUAREZ-FUENTES, | ) | |
| | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW OF A |
| | ) | DECISION OF THE BOARD OF |
| v. | ) | IMMIGRATION APPEALS |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General, | ) | OPINION |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before: MOORE, SUTTON, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge**. Frieri Misael Juarez-Fuentes ("Petitioner"), a citizen

of Guatemala, petitions for review of a final order of the Board of Immigration Appeals ("BIA")

affirming the decision of the Immigration Judge ("IJ") denying his request for withholding of

removal under the Immigration and Nationality Act and relief under the Convention Against Torture

("CAT").[1]  We conclude that the BIA's decision denying relief was supported by substantial

evidence.  Accordingly, the petition for review is DENIED.

## I.  FACTS AND PROCEDURAL HISTORY

We glean the following facts from Petitioner's testimony before the IJ.  Petitioner first

entered the United States illegally in 1991 and resided in Florida.  Having just received a teaching

certificate in Guatemala in 1990, he feared harm from the guerrillas and paramilitary groups who

---

[1]Petitioner conceded he is removable, and he did not pursue asylum before the IJ.  AR at 153.

1

disliked teachers and other professionals. While living in Florida, Petitioner converted from the Catholic to the Pentecostal faith. He remained in this country until 1992 when he voluntarily departed to Guatemala after his application for asylum was denied.

Petitioner worked as a security guard in Guatemala for five years between 1992 and 1998. Because he carried a gun, he did not have difficulty with paramilitary groups. In 1998 and 1999, Petitioner taught elementary school and used public transportation to get to and from work. Although a peace accord had been reached two years earlier, paramilitary groups continued to harass citizens. Guerrillas occasionally boarded the public buses and demanded money from all passengers. The guerrillas beat Petitioner and demanded money from him several times. According to Petitioner, teachers discouraged communism and counseled people not to take the law into their own hands, so guerrillas did not like them. Petitioner learned from others in the community that guerrillas had kidnapped teachers on several occasions, but Petitioner did not witness any abductions.

Petitioner remained active in the Pentecostal faith while he lived in Guatemala. He converted his children and his extended family members, except his wife, to his new faith. Petitioner and a few neighbors started a Pentecostal church and eventually purchased land on which they erected a church building. Church members went door-to-door trying to convert people. Petitioner also started a Good Samaritan group in his community to encourage children and teenagers to stay away from gangs and drugs.

Petitioner's religious activities caused problems for him because nearly everyone in the community was Catholic. People called him a "hypocrite" because he previously practiced Catholicism and was a leader in the Catholic church. People threw rocks at him, and the "Catechists" beat him four to five times for preaching the Gospel in the community. Gangs also

2

assaulted him about twenty times between 1993 and 2000 for preaching the Gospel, but he did not report these assaults to the police. During one assault, all five fingers on his right hand were broken. He received holistic treatment for this injury.

Petitioner's brother, Aramis Juarez-Fuentes, began studying to be a pastor in 2002. In 2004 he took over as minister of the Powerful Unction and Miracles Pentecostal Church in Guatemala. "Catechists" also assaulted Aramis on several occasions because he preaches the Pentecostal faith.

Petitioner returned to the United States illegally in April 2000, leaving behind his wife and three children. He settled in Georgia and fathered three more children. He attends a Pentecostal church and sends monetary support to several Pentecostal churches in Guatemala, although he does not keep any receipts for wire transfers of funds. He produced letters from four Guatemalan pastors, including his brother, thanking him for supporting the churches and sending money.

In addition to the difficulties already mentioned, Petitioner explained that his fear of persecution in Guatemala arises in part from several experiences he had as a child. He recalled that members of FARC, the revolutionary armed party of Guatemala, stole animals from his family to feed their troops. Armed guerrillas went door-to-door, requiring community members to move to the center of town to listen to their propaganda. When Petitioner was 12 years old, his family and other community members were standing in front of the Catholic church. Armed guerrillas appeared and kidnapped his cousin Tomas, who was 16 or 17 years old. The guerrillas told Tomas's parents that they were taking their son to fight for the guerrillas. Tomas was not seen or heard from again. When Tomas had been missing three months, his mother, Petitioner's aunt, filed a report with local officials about her son's disappearance. Petitioner's father obtained a copy of the report and sent it to Petitioner. The report was dated March 10, 1983, and stated that Tomas disappeared on December

3

15, 1982. Petitioner's father apologized for the delay in obtaining the report. He explained that he had to convince Tomas's mother to request the report "because she is still scared for what happened to her son that never appeared." AR 284.

Finally, Petitioner claimed that, in 2007, his daughter told him that someone tried to kill his wife and children by throwing a cloth or rag poisoned with an agricultural pesticide into the house. Although Petitioner's daughter had no proof of who committed the deed, she was convinced that a gang did it because Petitioner's children are leaders in the Pentecostal church in Guatemala. The police refused to take the family's report about the incident because no one was injured. Petitioner fears returning to Guatemala because he is afraid of "the seed he planted there," meaning the Pentecostal church, and growing gang violence.

Prior to giving his testimony, Petitioner made ten corrections to his written application for relief. He amended his telephone number, date of birth, children's dates of birth, number of children (twins born after the application was filed), employment, and involvement in the Pentecostal church. He also changed his kidnapped cousin's name from Francisco Lopez to Tomas Saul Miranda-Fuentes and amended the date of Tomas's kidnapping from "the 1990's" to 1982. The application stated that Tomas "died as a result of . . . torture." AR 514.

The IJ found that Petitioner was not a credible witness because his written application omitted important facts, his testimony contained key inconsistencies and discrepancies, and the documentary evidence further undermined Petitioner's veracity. The IJ also ruled that Petitioner failed to produce corroborating evidence that appeared to be available. Even if Petitioner could be considered credible, the IJ denied relief on the merits. However, the IJ granted Petitioner's alternative request for voluntary departure and directed Petitioner to file a $500 bond within five

4

business days of the date of the decision. Alternatively, the IJ ordered Petitioner removed to Guatemala if he failed to pay the bond in a timely manner.

The BIA affirmed the decision on appeal, concluding that the IJ gave "specific, cogent reasons to doubt" Petitioner's credibility. The BIA distinguished *Liti v. Gonzales*, 411 F.3d 631 (6th Cir. 2005), on the ground that Petitioner had not added detail to his written application, but had substantially altered his claim during his testimony. The BIA agreed that Petitioner failed to supply available corroborating evidence and failed to show his entitlement to withholding of removal or protection under CAT. Because Petitioner did not submit timely proof that he paid the bond, the BIA refused to reinstate the voluntary departure period and ordered Petitioner removed to Guatemala pursuant to the IJ's alternative order.

## II. ANALYSIS

### A. Standard of Review

"Because the BIA adopted and supplemented the IJ's decision, we review the opinion of the IJ in conjunction with the BIA's additional comments and discussion." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010). Because the BIA denied Petitioner relief, we review the agency's factual findings deferentially to determine whether the decision is supported by substantial evidence. *Stserba v. Holder*, 646 F.3d 964, 971 (6th Cir. 2011). We may reverse only if the decision was "manifestly contrary to law"; in other words, we must find that the evidence not only supports a contrary conclusion, but compels it. *Dugboe v. Holder*, 644 F.3d 462, 472 (6th Cir. 2011).

### B. Due process claim

Petitioner first contends that the IJ conducted herself inappropriately during the hearing, depriving him of due process of law. He claims that the IJ failed to maintain neutrality and instead

5

acted as a prosecutorial adversary who disrupted his lawyer's examination, confused him with lengthy questions immaterial to his claims, and distorted his testimony.

Because an alien is entitled to a full and fair hearing, we review *de novo* any alleged due process violation arising from a removal proceeding. *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). To evaluate whether fundamental fairness was denied, we ask whether there was a defect in the removal proceeding, and if so, whether the alien was prejudiced by the defect. *Id.* While an IJ has broad discretion to control a hearing for the ascertainment of truth, *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998), a neutral judge is undoubtedly a basic due process protection. *Vasha*, 410 F.3d at 872.

Having carefully reviewed the transcript of the hearing at issue, we agree that the IJ asked numerous pointed questions of both Petitioner and his counsel and that the IJ was, at times, confrontational and argumentative. We adopt the BIA's conclusion, however, that the IJ clarified the questions asked and the answers given so that she could better understand Petitioner's case. At times the IJ interjected to maintain order in the sequence of events about which the Petitioner was testifying, while on other occasions she ensured that the interpreter provided accurate translation. On the whole, we conclude that Petitioner received a full and fair hearing, and his due process rights were not violated. *See Vasha,* 410 F.3d at 872; *Mikhailevitch*, 146 F.3d at 391.

## C. Adverse credibility findings

Petitioner next contends that the BIA's decision to uphold the IJ's adverse credibility findings is not supported by substantial evidence. Although we question the factual support for some of the credibility findings, we are not ultimately compelled to reverse the BIA's decision. *See Dugboe*, 644 F.3d at 472.

6

The case is governed by the REAL ID Act of 2005 because Petitioner filed his application for relief after May 11, 2005. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). Under that Act, when an alien seeks withholding of removal and protection under CAT, the IJ's credibility determination must be based on the "totality of the circumstances" and consider "all relevant factors." *Id.* Such factors include:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1229a(c)(4)(C).

The agency found Petitioner not credible for several reasons: his written application failed to mention the numerous beatings he claimed to have suffered over many years at the hands of guerrillas, para-military groups, and "Catechists," particularly a beating in which five fingers were broken; Petitioner claimed in his application that Tomas died of torture, yet he testified no one knew what happened to Tomas; Petitioner claimed that his aunt did not want to obtain the report about Tomas's disappearance because of her emotional pain while Petitioner's father stated that the aunt was afraid to obtain the report; Petitioner failed to mention in his application that his brother, Aramis, was also beaten because of his Pentecostal faith; Petitioner claimed that he started the Good Samaritan group in Guatemala; and Petitioner's testimony about someone throwing a poisonous rag into the home of his wife and daughters, as well as his testimony about sending money to Pentecostal

churches in Guatemala lacked credibility because Petitioner did not produce corroborating evidence that likely was available.

With regard to Petitioner's omission of various beatings from the written application, we consider our prior decision in *Liti v. Gonzales*, 411 F.3d 631 (6th Cir. 2005). Although in *Liti* we applied prior law on inconsistencies going to the heart of the claim, we stated that the "absence of specific incidents in the application . . . does not give rise to the inference that the Litis are incredible, but rather reinforces their claim of a long history of political protest which cannot be limited to a few specific instances." *Id.* at 638. We rejected "the BIA's underlying rationale that the Litis are required to provide an exhaustive, detailed list of their anti-communist activities in their asylum application" because holding applicants to such a standard is unrealistic and unfair. *Id.* We further stated that the purpose of a removal hearing is to allow the alien to present evidence to elaborate on the generalized claims in the application, and not simply to reiterate the statements made in the application. *Id.* at 639.

*Liti* informs our analysis here. In the amended written application, Petitioner stated that teachers and other professionals were often targeted for assault by paramilitary groups and gangs in Guatemala. He reported that he "was a victim of . . . robberies" on the bus and "witnessed several of my fellow colleague teachers being assaulted by the paramilitary and gangs." AR 514, 522. He further stated in the application that he fears returning to Guatemala because he is a teacher and a member of the Pentecostal church and he is afraid he will be targeted for persecution by paramilitary groups or gangs. AR 514–15, 522. During the hearing, Petitioner added detail about the attacks generally described in the application. While the written document did not refer to "Catechists," Petitioner testified about various forms of persecution he claimed to have endured due to his

8

conversion to the Pentecostal faith, as generally reported in the application. *See Liti*, 411 F.3d at 639. Thus, the purported omission of specific instances of beatings from the written application does not support an adverse credibility finding.

We also agree with Petitioner that the adverse credibility finding predicated on a minor distinction in the explanations about why Petitioner's aunt had to be coaxed to obtain a report about the disappearance of her son is not supported by substantial evidence. *See Stserba*, 646 F.3d at 971. Petitioner's father explained in a letter that the delay occurred because the aunt "is still scared for what happened to her son that never appeared." AR 284. Petitioner testified that his aunt "doesn't want anything to do with the case of her son. . . . Because his disappearance continues to be a pain that she bears." AR 204. When the IJ perceived a discrepancy in these explanations, Petitioner clarified that, after speaking with his father personally, he understood the problem to be that his aunt "felt fear, a fear of remembering the things that occurred to her." AR 267. Because it appears that Petitioner and his father used slightly different words to convey similar meaning, the adverse credibility finding on this ground lacks substantial evidentiary support.

On the other hand, certain aspects of the case cast doubt on Petitioner's credibility, as the BIA and the IJ found. For example, Petitioner testified that he and two others were the first to form the Good Samaritan group in Guatemala before 1991. He claimed they had not heard of the name before and they chose the name because they liked it. AR 223–24. When the IJ mentioned that she had previously heard other applicants for relief discuss the Good Samaritan group and questioned Petitioner's role in forming the group, Petitioner clarified that "[t]here are a lot of different groups that are called Good Samaritan in Guatemala" and his group was the first "in the community of San Jose Caben." AR 223–24, 227. Additionally, Petitioner claimed in his application that Tomas died

9

of torture, but Petitioner testified no one actually knew what happened to Tomas. Petitioner did not explain why he changed the name of his kidnapped cousin from Francisco Lopez to Tomas Saul Miranda-Fuentes or why he changed the date of Tomas's disappearance from the "1990's" to 1982.

Further, Petitioner did not provide corroborative evidence of his own or Aramis's beatings, his teaching credentials, the alleged poisoning of his family, or his wire transfers of funds to support Pentecostal churches in Guatemala. *See Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009) (observing corroborating evidence should be provided where it is reasonable to expect such evidence to exist). We will not reverse unless we find that a reasonable trier of fact is compelled to conclude that corroborating evidence is not available. *Id.* We cannot make that finding here. Although we conclude that some minor discrepancies underlying the adverse credibility determination are not supported by substantial evidence, certain other discrepancies, combined with lack of corroborating evidence, indicate that Petitioner attempted to enhance his claims of persecution. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 674–75 (6th Cir. 2008). Consequently, we are not compelled to reach a different ultimate conclusion on the issue of Petitioner's credibility. *See id.* at 675.

## D. Withholding of removal and CAT

To qualify for withholding of removal, Petitioner must show that, if he is forced to return to Guatemala, there is a clear probability that he will be subject to persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See Vasha*, 410 F.3d at 875; *Ndrecaj*, 522 F.3d at 677. To establish a clear probability, Petitioner must demonstrate it is more likely than not that he will be persecuted on his return to that country. *Vasha*, 410 F.3d at 875. Similarly, to satisfy eligibility under the CAT, Petitioner must show it is more likely than not that he will be tortured if removed to Guatemala. *Ndrecaj*, 522 F.3d at 677. We are required to

uphold the BIA's decision unless it is manifestly contrary to the law. *See id.* Administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. *Id.*

Due to the problems with Petitioner's credibility and the lack of supporting documentation on key points, we must uphold the BIA's decision to deny withholding of removal and protection under CAT because the decision is not manifestly contrary to law. Petitioner failed to meet his heightened burden to show a clear probability that he will be persecuted on account of a protected ground or that it is more likely than not that he will be tortured if he is removed to Guatemala.

**E. Bond**

Finally, Petitioner argues that the BIA erred in denying voluntary departure where the IJ failed to advise the Petitioner to provide the BIA with proof that he paid the bond in a timely manner. We need not resolve this issue because Petitioner's filing of a petition for review automatically terminated the IJ's grant of voluntary departure and rendered effective the IJ's alternative order for removal. 8 C.F.R. § 1240.26(i); *Giraldo v. Holder*, 654 F.3d 609, 617 (6th Cir. 2011).

## III. CONCLUSION

For all of the reasons stated, the petition for review of the BIA's decision denying withholding of removal and protection under CAT is DENIED.

11