NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0306n.06
Filed: May 3, 2006

No. 05-3082

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

IVZI NAZARKO; ADRIATIK NAZARKO;
IVZJOL NAZARKO; MIRANDA NAZARKO,

      Petitioners,                         On Appeal from the Immigration
                                          and Naturalization Service

v.

ALBERTO GONZALES,

      Respondent.

———————————————————————/

BEFORE:    RYAN, CLAY, and GILMAN, Circuit Judges.

      RYAN, Circuit Judge.    Petitioners, Ivzi Nazarko, Adriatik Nazarko, Ivzjol

Nazarko, and Miranda Nazarko ("Nazarko, et al."), appeal an order of the Board of

Immigration Appeals (BIA) adopting and affirming an Immigration Judge's (IJ) denial of

Nazarko, et al.'s claim for asylum, withholding of removal, and protection under the

Convention Against Torture.  Because we find substantial evidence supports the IJ's

decision, we **DENY** Nazarko, et al.'s petition for review.

**I.**

      Nazarko, et al. are citizens of Albania.  Ivzi is Adriatik's father; Ivzjol and Miranda are

Adriatik's wife and child.  They separately entered the United States on nonimmigrant

visitor visas in the late 1990s.  Ivzi entered on June 19, 1997, and Adriatik arrived on

August 5, 1996, while his wife and child came later.  In late 1997, the Immigration and

Naturalization Service (INS) issued notices for Nazarko, et al. to appear at deportation hearings, as they had overstayed their nonimmigrant visitor visas.

At the hearing Ivzi and Adriatik Nazarko testified that they suffered persecution in Albania because, they said, they came from a wealthy family and were involved in political activities during and after the communist government.  On their asylum applications both men checked that they had been persecuted on the basis of political belief and on the basis of social status.  Ivzi and Adriatik each also began their application statements by noting that their family along with other wealthy families had been labeled "Kulak" by the communists—a derogatory name that put them "at the bottom of the social strata."  Their testimony described persecution that took place over several decades, much of it under the communist regime that was hostile to the Nazarko family and other "Kulak."

Adriatik also testified that he had been persecuted since the fall of the communist government, and in particular, that he was beaten by Democratic Party "gang members," who also damaged his restaurant.  Ivzi testified that he was beaten at a roadblock by the same men, members of the Socialist Party who were angry that Adriatik left Albania after the beating at the restaurant.  Money was stolen from a safe during the restaurant attack, and Ivzi's wallet was stolen during the roadblock attack.  Ivzi and Adriatik also testified they were threatened with future harm during these attacks.  They offered police reports of the incidents, which indicate that the unknown assailants, who were armed, inter alia, with a screwdriver, knife, and stones, "immediately" fled on both occasions at the approach of ordinary "citizen[s]" and "peasants."

The IJ issued an oral decision on October 9, 2003, concluding that the petitioners were not credible and failed to meet the "well-founded fear" standard of a petition for asylum claim or the "clear probability" standard of a withholding of removal claim. An appeal was made to the BIA, which adopted and affirmed the decision of the IJ. In addition to affirming the IJ's finding that the parties failed to make the necessary showing to warrant relief, the BIA also held in a footnote that Adriatik's asylum application was untimely. Nazarko, et al. now appeal that decision to this court, claiming the BIA erred.

**II.**

"Because the BIA adopted the IJ's reasoning with respect to [Nazarko, et al.'s] . . . claims for asylum and withholding of removal, we review . . . the IJ's decision directly." Singh v. Ashcroft 398 F.3d 396, 401 (6th Cir. 2005). The IJ's legal conclusions are reviewed de novo, and the factual findings are reviewed for substantial evidence. Tapucu v. Gonzales, 399 F.3d 736, 738 (6th Cir. 2005). We must uphold the IJ's determination that an alien is not eligible for asylum if the decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," and it can be reversed only if "a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks and citation omitted).

Under the Immigration and Nationality Act (INA), the Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1)(A). The INA defines a "refugee" as an alien who is "unable or unwilling" to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant for asylum bears the burden of establishing that the "well-founded fear of persecution" is "both subjectively genuine and objectively reasonable." Akhtar v. Gonzales, 406 F.3d 399, 404 (6th Cir. 2005) (citation omitted).

To qualify for withholding of removal under 8 U.S.C. § 1231(b)(3)(A), the applicant must establish a "clear probability of persecution" by showing that it is more likely than not that he will be persecuted. INS v. Stevic, 467 U.S. 407, 413 (1984). To qualify for withholding under the Convention Against Torture, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The torture need not be on account of a protected ground. Castellano-Chacon v. INS, 341 F.3d 533, 551-52 (6th Cir. 2003).

Nazarko, et al. challenge several aspects of the IJ's rejection of their petitions for asylum, claiming that the IJ made "'inferences or presumptions that are not reasonably grounded in the record'" and that the record "'would compel a reasonable factfinder to make a contrary determination.'" (Citations omitted.) It is apparent, however, that the record on the whole shows that the IJ's decision rests on substantial evidence.

First, the IJ relied on the 2001 U.S. Department of State Profile of Asylum Claims and Country Conditions for Albania, which states that, despite the prevalence of crime and police corruption, "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds." Report, at 4 (May 2001). Nazarko, et al. contest this reliance, claiming the reports are "sugar coated" to downplay problems in Albania This statement is odd, not only because the report mentions widespread crime and blood feuds

in Albania, but because it also ignores the fact that such reports are a source of information "we have relied on . . . when reviewing an IJ's decision." Mullai v. Ashcroft, 385 F.3d 635, 639 (6th Cir. 2004). The IJ's reliance in this case is entirely appropriate.

Second, the IJ found that the testimony of Ivzi and Adriatik about the attacks was not "consistent" and specifically not "credible." This is amply supported by the transcript of the hearing, where Ivzi stated the restaurant attack was conducted by socialists who were angered by the family's membership in the democratic party, but Adriatik stated the attackers were themselves associates of the democratic party. It is hard to imagine a scenario where both of these statements could be accurate. Adriatik's statements lack even internal consistency. His 1997 application statement relates that "a group of young gangsters" tried to kill him because he and "a few of [the] other peasants . . . tried to stop them from performing acts of vandalism." He mentions that they are "perhaps connected to the Mafia Organization who want to bring back Communism." This differs from his 1998 statement, where they are dubbed "the Group of Five Shops," who "escort the President" and were organized by the "Democratic Party." By the time of his testimony in 2003, Adriatik agreed to call the men "the Five Stars Gang" and claimed they spent "every day and every night" with the Democratic Party.

The same is true for Ivzi, who said in his 1997 asylum statement that those who threatened his family after Adriatik left demanded money, specifically "50.000$." When asked during his 1998 testimony, however, if there was anything he "could have done that would have changed their minds," his response did not mention money, but said those who threatened him would be satisfied only if he were "to give [up] the democracy and join

them." Some slight additional support for the IJ's credulity determination also derives from the IJ's statement to a Nazarko family member attending the hearing, apparently Ivzi, that it was inappropriate to "signal answers to your son while he's testifying" and threat to remove Ivzi from the courtroom. In light of these considerations, we think there is substantial evidence to support the IJ's asylum decision and certainly, we are not compelled by the evidence to conclude otherwise.

It necessarily follows, then, that the record cannot compel the more stringent "clear probability" finding required for a withholding of removal claim under 8 U.S.C. § 1231(b)(3)(A). See Pilica v. Ashcroft, 388 F.3d 941, 951 (6th Cir. 2004). We are also left with the conclusion that substantial evidence supports the IJ's decision to deny Nazarko, et al. protection under the Convention Against Torture because the record fails to establish that it is "more likely than not" that Nazarko, et al. will be tortured if forced to return to Albania. 8 C.F.R. § 1208.16(c)(2).

### III.

Lastly, we note that Adriatik challenges the BIA's finding that his asylum application was untimely. Timeliness determinations are normally beyond the jurisdiction of this court, per 8 U.S.C. § 1158(a)(3), but Adriatik argues that this case falls under the exception made in Gjyzi v. Ashcroft, 386 F.3d 710 (6th Cir. 2004). We think the facts of this case are distinguishable from Gjyzi, wherein the BIA reversed the IJ's adverse credibility finding, but upheld, without explanation, the IJ's timeliness ruling that had been based solely on the adverse credibility finding. See id. at 714. No such facts are presented here, where the BIA based its footnote on Adriatik's dates of entry and application. Whatever due process

requirements exist by virtue of 8 C.F.R. § 208.4(a) appear to have been met here.  At the hearing, the IJ specifically questioned Adriatik as to the date of his first application for asylum, why he did not make one sooner, and eventually established that Adriatik had first sought assistance from a paralegal.  Additionally, we note that the exercise of jurisdiction over the timeliness issue would be fruitless in this case, where substantial evidence supports the IJ's denial of Adriatik's claim.

**IV.**

For the reasons set forth above, we **DENY** Nazarko, et al.'s petition for review.

**CLAY, Circuit Judge, dissenting.** I would find that the BIA's determination is not supported by substantial evidence. The lead opinion substitutes its own reading of the record and rationale for that actually provided by the immigration judge. The proper role of this Court, however, is to consider whether the immigration judge's rationale for denying relief is supported by substantial evidence, and not whether some rationale this Court can construct can be supported by the evidence in the record. The lead opinion further ignores the disturbing focus by the immigration judge on Petitioners' "Albanian features," a focus sufficiently improper to justify in and of itself a vacatur of the decision below. I would therefore vacate the BIA's decision and remand this case for further proceedings.

## I.

## BACKGROUND

### A.     Procedural History

Petitioner Adriatik Nazarko and Miranda Nazarko, husband and wife, entered the United States on or about August 5, 1996 on nonimigrant visitor's visas with authorization to remain within the country until August 4,1997. Petitioners Ivzi Nazarko, Adriatik's father, and Ivzol Nazarko, Adriatik's minor son, entered the United States on or about June 19, 1997 on nonimmigrant visitor's visas with authorization to remain within the country until September 15, 1997. Adriatik filed an application for asylum on October 9, 1997, although there is evidence in the record that he made unsuccessful efforts to prepare an application

as early as February 1997. Miranda and Ivzol Nazarko were listed as dependants on Adriatik's application.[1]

After Adriatik overstayed his visa, the Immigration and Naturalization Service ("INS") commenced removal proceeding against him on November 25, 1997. Similarly, after Ivzi overstayed his visa, the INS commenced removal proceedings on November 26, 1997. In preliminary hearings before an immigration judge, both Adriatik and Ivzi conceded removability. Ivzi testified before immigration judge Walsh on August 19, 1998. The proceedings were stayed for some time and then both Ivzi and Adriatik testified before immigration judge Ford on October 6, 2003, after the Nazarko family's applications had been consolidated for hearing purposes. One other witness appeared for the Nazarkos on October 3, 2003, but immigration judge Ford determined that the witness' deafness (previously unknown to the court) precluded that witness' testimony in court; counsel for the Nazarkos made a proffer concerning the expected testimony. The INS did not present any witnesses, but placed United States Department of State reports on Albanian country conditions into evidence.

## B.    Substantive Facts

The Petitioners are an Albanian family. The lead Petitioners, Ivzi and Adriatik, are father and son. Miranda and Ivzrol are Adriatik's wife and minor son, respectively. Ivzi and

---

[1]In his initial application for asylum, Adriatik lists his wife and minor children, but checked the box indicating that neither of his children were located within the United States. In his second application for asylum, prepared in 1998 (filing date uncertain for lack of date stamp, *see* J.A. at 688), Adriatik includes his wife and his two children as dependents on his application. Adriatik's older son's case was apparently not consolidated with the four Petitioners now presenting to this Court.

Adriatik testified to the family's persecution under the former Albanian Communist regime. The Nazarko family had been a wealthy family before the Communist era. Their past wealth, however, in conjunction with their open political opposition, resulted in routine persecution by the government during the Communist era, including a forced move of the family to an internment camp. As Communist control over Albania weakened, however, the Nazarkos became increasingly active in the democratic movement, and Adriatik joined the emerging Democratic Party.

Adriatik and Ivzi testified to several incidents of persecution over the course of the 1990s. In 1991, Adriatik was involved in a demonstration which pulled down the statue of a former Communist leader, was arrested, beaten, and imprisoned for two months before pressure from the Democratic Party procured his release. Shortly thereafter, elections in Albania brought the Democratic Party into political power.

Adriatik and Ivzi, however, testified that former communists and their sympathizers remained within areas of government, and especially the police force, and were apparently not subject to significant central control. Adriatik and Ivzi testified that the family attempted to run a bus service between Albania and Greece in 1991 and 1992, but repeated interference by local authorities, including excessive and unreasonable fines, precluded the bus service from properly operating. In addition, both men testified that during one trip, the bus Adriatik was driving was stopped by the police, who beat Adriatik and detained him for three hours before releasing him. Adriatik and Ivzi also testified that they experienced similar harassment when attempting to get a driving school off the ground in Albania.

During this period, Adriatik stated in his application for asylum that the governing Democratic Party was becoming increasingly corrupt. The Nazarko family had been pursuing avenues to reclaim property formerly confiscated from them by the Communist regime. The Democratic Party-controlled government resisted the Nazarko family efforts in favor of selling at least some of the land in question to foreign purchasers. Adriatik stated in his application that he was vocal about his criticism of the government. The President of the Democratic Party, along with other party officials, resigned from the Party sometime in 1995. As a result of this, Adriatik stated that he no longer saw the point in belonging to the Democratic Party, and himself resigned in August 1995. At that point, the government's harassment directed at his family escalated, including interference with the driving school.

Ivzi and Adriatik testified that the family opened a restaurant in 1995, only to experience a pattern of harassment directed at that business as well. Adriatik stated in his asylum application that the members of the "Group of Five Shops" would come into his restaurant, eat, and then leave without paying. Adriatik described the "Group of Five Shops" as a group organized by the Democratic Party and the Albanian secret police. Ivzi testified that in late June 1996, a group of government officials, who Ivzi stated were members of the Socialist Party, had come to the restaurant and made generalized threats to Ivzi that "we'll take over again" and that "we're going to do whatever we can in order for you to go back where you were." (J.A. at 187.)

In particular, Adriatik and Ivzi testified to an incident on June 30, 1996, in which four men came into the restaurant and beat Adriatik so severely that he was hospitalized for 21

days.  A police report and hospitalization record, both found in the record, corroborate Adriatik's and Ivzi's account of the incident.  While there was some question put forth in the 1998 hearing as to the admissibility of these documents due to irregular translation certificates, the immigration judge declined to enter a final ruling on the matter, and when the hearings recommenced in 2003, certification issues were not re-raised.

Adriatik testified that the men responsible for the beating were members of the government-backed "Group of Five Shops."  When asked why these men attacked him, Adriatik testified that the prior month he had been working as a election committee member for a national referendum, and that although the Democratic Party wanted this referendum passed, the populace generally opposed the measure.  Adriatik elsewhere stated that while working the May 1996 referendum election, he witnessed Democratic Party officials stuffing ballot boxes but had been powerless to prevent their actions.  The connection between Adriatik's beating and his work as an election committee member was not further developed.

Ivzi  also described the men as belonging to "the Group of Five Shops" which he described as a "very dangerous Mafia group" organized by the Democratic Party.  (J.A. at 463.)  Ivzi also testified that while he considered the "Democratic Party" to be his "mother," he felt that "people who are claiming to be democrats are the communists."  (J.A. at 180.) Ivzi testified that while he did not know who paid the men who attacked Adriatik, "they are known as secret police" and that he believed that they were members of the Socialist Party because they came from Communist families.   Ivzi testified that he knew one of the

attackers by name and that he had seen the others working for the police and for the courts.

While Adriatik was hospitalized, Miranda procured passports for herself and Adriatik. Upon his release from the hospital, Ivzi took Adriatik and Miranda to stay with friends in another city while they pursued visas to exit the country. Ivzi returned to the family's home town to stay with Adriatik's two minor children. Adriatik and Miranda were able to procure visitor's visas for the United States in late July 1996 and left Albania on August 4, 1996.

After Adriatik's departure, men continued to harass Ivzi, threatening to kidnap and kill Adriatik's children and Ivzi himself in retaliation for Adriatik's flight. On September 20, 1996, Ivzi testified that the same group of men who had beaten Adriatik stopped Ivzi's car with a roadblock and beat Ivzi so badly that Ivzi was hospitalized for 20 days. At the hearing, Ivzi presented a police report of the incident along with a medical record for his hospitalization. While there was some question put forth in the 1998 hearing as to the admissibility of these documents due to irregular translation certificates, the immigration judge declined to enter a final ruling on the matter, and when the hearings recommenced in 2003, certification issues were not re-raised.

Shortly after Ivzi was released from the hospital, Adriatik's second son apparently was manifesting a medical disorder believed at the time to be a form of epilepsy. Ivzi procured visas for himself and his ill grandson to come to the United States for medical treatment, but was unable to procure visas for his other grandson and his wife. Ivzi and his younger grandson arrived in the United States in December 1996. Apparently, Ivzi's wife

and other grandson were able to procure forged visas and arrived in the United States sometime in 1997 or 1998.

## II.

## PERSECUTION FINDINGS

### A.    Standard of Review

"Where the BIA adopts the [immigration judge's] reasoning, [this Court] reviews the [immigration judge's] decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). When reviewing the immigration judge's decision, however, this Court will also consider any additional comments of the BIA. *Id.* at 283. In reviewing the factual determinations of petitioner's statutory ineligibility for asylum or withholding of removal, the Court must uphold the Board's decision if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). This standard is deferential, and the Court may not reverse the Board's determination simply because the court would have reached a different conclusion. *Id.* The Board must, however, "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463, U.S. 29, 42 (1983). This connection between the rationale given and the action taken is critical, for it is not the role of this Court to invent a rational explanation for an agency's action when the agency itself has failed to provide one. *Id.*

Credibility and persecution determinations in removal hearings, as findings of fact, are reviewed under the same substantial evidence standard. *See* 8 U.S.C. § 1252(b)(4)(B)(2000). While an adverse credibility finding is afforded this substantial deference, the finding must be supported by specific reasons. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004); *Gao v. Ashcroft*, 299 F.3d 266, 276 (3d Cir. 2002) ("The reasons must be substantial and bear a legitimate nexus to the finding."). An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They "cannot be based on an irrelevant inconsistency." *Daneshvar*, 355 F.3d at 619 n.2. "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* at 623 (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

## B.    Legal Standard for Asylum and Withholding of Removal

The Attorney General has discretion under the INA to grant asylum to a "refugee." INA § 208(b), 8 U.S.C. § 1158(b). A refugee is defined as a person who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

As the applicants seeking asylum, Petitioners bear the burden of proof of establishing eligibility for asylum as refugees "either because [they have] suffered actual past persecution or because [they have] a well-founded fear of future persecution." *See* 8 C.F.R. § 208.13; *Mikhailevitch*, 146 F.3d at 389. "An applicant's fear of persecution must be both subjectively genuine and objectively reasonable." *Id.* The Act provides no

definition of "persecution," but this Court has defined persecution "within the meaning of 8 U.S.C. § 1101(a)(42)(A)" as requiring "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* at 389-90.  The persecution must also come from government sources; mere social unrest or fear of general violence are not grounds for asylum. *See id.*  Finally,  Petitioners' alleged fear of persecution must be "on account of" the Act's protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 162 (1993).

Unlike asylum, withholding of removal prohibits the Attorney General from removing "an alien to a country where his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3).  "The alien must demonstrate a clear probability of persecution with objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation." *Kapcia v. INS*, 944 F.2d 702, 709 (10th Cir. 1991) (internal quotation omitted).  This standard is a higher standard than that for asylum.  *See Mikhailevitch*, 146 F.3d at 391.  A petitioner unable to meet the persecution showing for asylum cannot meet the standard for withholding of removal.  *Id.*

## C.    The Immigration Judge's Opinion

The immigration judge held that Petitioners failed to establish persecution in the past or a well-founded fear of persecution in the future.  The immigration judge stated that Petitioners "contend that [the] family are members of a particular social group, and, because of that they have been persecuted because they were wealthy landowners in

Albania." (J.A. at 67.)  The immigration judge went on to note that "there is no immutable characteristic, or feature, of any of [Petitioners], which, would lead the Court to find that they are members of any particular social group.  Here, the [Petitioners] all look Albanian, and have features not unlike any other that the Court has seen."  (J.A. at 67.)

The immigration judge found that Petitioners had failed to demonstrate past persecution.  The judge found the Adriatik and Ivzi's testimony concerning the June 30, 1996 beating of Adriatik inconsistent and therefore not credible.  The immigration judge also found that "there was not evidence presented" that the people who beat Adriatik had "anything to do with the government."  (J.A. at 67.)  The immigration judge referred specifically to Adriatik's reference to the men as a "gang" when asked on cross examination whether he considered the men to be part of a gang.  (J.A. at 67-68.)  The judge noted that "criminal activity, and specifically that of gang members, is not a basis for asylum."  (J.A. at 68.)

Neither did the judge find that Petitioners had a well-founded fear of future persecution.  The immigration judge noted that "there is no indication, based on current country conditions[,] specifically the Profile of Asylum Claims and Country Conditions dated May[] 2001, which, would give the Court any concern that the individuals would be persecuted."  (J.A. at 67.)  The judge quoted from the report, which states that "all political parties have been active in most parts of the country without a pattern of mistreatment, even during the dark days of 1997."  (J.A. at 68.)

**D.    The Immigration Judge's Factual Findings Are Not Supported by Substantial Evidence**

The immigration judge's findings are not supported by substantial evidence. Overall, the immigration judge's opinion rendering his decision is brief. After a somewhat loose recitation of the substance of Ivzi's and Adriatik's testimony, the immigration judge rendered an oral opinion consisting of less than five typed, double-spaced pages, two of which were dedicated to a summary of relevant law. The factual findings which the judge did make were very general and backed by little specificity. Moreover, the factual elements which the judge *did* point out with specificity as supporting his decision are not supported in turn by the record.

Perhaps most egregiously, the immigration judge failed to recognize that Petitioners were seeking asylum on the basis of political opinion. Rather, the immigration judge appeared to think that Petitioners were seeking asylum because they were subject to criminal attacks as a wealthy family. (J.A. at 67 (stating that Petitioners "contend that his family are members of a particular social group, and, because of that they have been persecuted because they were wealthy landowners in Albania.").) Both Ivzi and Adriatik indicated in their applications for asylum that they were seeking asylum status on the basis of their political opinion. Their testimony at the hearing bore out such a basis. Adriatik testified that he was among the first to join the Democratic Party when it formed in the early 1990s. Ivzi and Adriatik testified that, along with their family, they had been opponents of the communist regime and advocates for change. Their activism continued into the 1990s as Adriatik continued to be actively involved in politics, to the point of resigning the Democratic Party in 1995 due to Adriatik's perception of growing corruption within the party and rising influence of former communists.

Ivzi and Adriatik did refer on a number of occasions to their past wealth, the confiscation of their property under the communist regime, and their continued problems in regaining that property under the Democratic Party's government of the mid 1990s. This commentary, however, is not inconsistent with persecution for political opinion, given the social and wealth divide upon which communism bases its fundamental premise. Ivzi and Adriatik did testify that they actively opposed certain government actions and policies in the 1990s, making their claims for asylum based on more than their former wealth status.

This failure of the immigration judge to recognize the basis upon which Petitioners were seeking asylum might be sufficient, even standing alone, to indicate that the decision below is not based on "substantial evidence" because a fair reading of Petitioners' arguments compels a conclusion that the basis of Petitioners' asylum claim is political opinion, not mere social status. The immigration's judge's apparent focus on Petitioners' physical features ("Here, the [Petitioners] all look Albanian, and have features not unlike any other that the Court has seen") is particularly disturbing, for this focus not only evinces the immigration judge's failure to grasp Petitioners' core claims, but carries with it certain inferences which are particularly troubling.

Neither do I find that the BIA's opinion, rendered upon direct review of the immigration judge's decision, was able to cure the immigration judge's apparent inability to recognize the political basis of Petitioners' asylum applications. The BIA "adopt[ed] and affirm[ed] the well-reasoned decision of the Immigration Judge." (J.A. at 3.) The BIA decision focused on the factual findings of the immigration judge, concluding that the immigration judge correctly found that Petitioners had failed to show that their mistreatment

was "motivated by the respondent's family status or political belief." (J.A. at 3.) While this statement shows that the BIA (as opposed to the immigration judge) seemed to recognize, at least in part, the Petitioners were seeking asylum because of persecution based on political beliefs, the BIA's opinion does not recognize that the immigration judge's factual findings on persecution were influenced by his failure to recognize the political opinion basis for Petitioners' asylum claims. While it is true that this Court may consider additional analysis performed by the BIA when reviewing an immigration judge's decision for support by substantial evidence, see Gilaj, 408 F.3d at 283, the BIA's opinion does not represent the sort of well-reasoned analysis that is able to overcome the shortcomings in an immigration judge's opinion.

To compound his mistake, the immigration judge made further "findings" that are unsupported by the record. In fact, none of the immigration judge's findings are supported in the record. In particular, the immigration judge found that Ivzi and Adriatik testified inconsistently with each other regarding the June 1996 attack on Adriatik. The judge made no further specific findings of where and how the testimony was inconsistent. A review of all drafts of Petitioners' asylum applications, the testimony taken in 1998, and the testimony offered in 2003 fails to uncover a single inconsistency between the father and son's testimony or asylum applications. Both Ivzi and Adriatik testified repeatedly and in detail to the events of June 30, 1996. Both father and son testified that the men involved in the incident belonged to the "Group of Five Shops" and that this group was organized by the Democratic Party, the then-governing party in Albania.

The immigration judge may have adopted the government's characterization of the father and son's testimony as inconsistent because the father at times referred to the men as "socialists," while Adriatik referred to the men only by reference to the "Group of Five Shops" and the Democratic Party. Ivzi's characterization is not inconsistent with Adriatik's, however, if one considers that Ivzi also testified that he felt that "people who are claiming to be democrats are the communists." (J.A. at 180.) A careful reading of the complete record makes it clear that the Ivzi viewed the Democratic Party as increasingly infiltrated by former Communist sympathizers. This is not an inconsistency. Ivzi's characterization is even more consistent with Adriatik's if one considers that Adriatik withdrew from the Democratic Party in 1995 after witnessing increasing corruption and a return to older ways. When one considers that the men viewed the Democratic party as increasingly influenced by former socialists, a reviewing court cannot extract isolated references to one political party or the other and then claim that such excerpts show "substantial evidence" in the record to support the immigration judge's conclusions. The obvious nature of Petitioners' claim would therefore make it impossible for an immigration judge to erroneously construe the record, a result inconsistent with the concept of appellate review.

This unexplainable credibility finding by the immigration judge appears to have made him doubt even the occurrence of the June 30, 1996 beating. The immigration judge goes on to say that "there was no evidence presented[] that the individuals, if there were four who came to the restaurant . . . [and] were in fact there[,] that they have anything to do with the government." (J.A. at 67.) Yet both Ivzi and Adriatik testified consistently and in detail as to the events of June 30, 1996, and Adriatik presented both a police report and hospital

discharge record which corroborate the occurrence of a beating at the restaurant on that date, the severity of Adriatik's injuries, and the length of his hospital stay. The immigration judge made no finding that these documents could not be considered. Even more disturbing, the immigration judge appears to have forgotten their existence in rendering his final opinion.

The immigration judge's assertion that no evidence existed which tied Adriatik's assailants to the government dismisses entirely the testimony of Petitioners. While Petitioners named the assailants as members of the "gang," and Ivzi did use the term "mafia" to describe the family's persecutors, both men testified that their persecutors were otherwise known as the "Group of Five Shops," a group with close connections to government bodies. Neither Petitioner ever asserted that these were mere gang members or criminal syndicate representatives. Rather, Petitioners use of the term "gang" and "mafia" were loose references to the type of behavior expected from this group of men. Petitioners consistently linked the Group of Five Shops to political repression at the direction of the government. Both Petitioners asserted that the Group of Five Shops was closely associated with the Democratic Party, and that members of the group had been seen accompanying Democratic Party government officials. The immigration judge's assertion that "no evidence exists" is therefore belied by the record itself, and I am compelled to conclude that evidence does exist, albeit in testimonial form, but evidence nonetheless.

While the immigration judge's conclusion regarding the assault on Adriatik is unsupported by the record, the judge's conclusion that Ivzi suffered no past persecution is

unsupported, period. The immigration judge makes no reference to whether he found Ivzi's testimony as to the assault he suffered at the hands of his son's assailants on an Albanian roadway credible or not. Indeed, the immigration judge makes no reference at all to the assault in the opinion portion of his decision. Without specific findings, this Court has insufficient basis for review. See *Motor Vehicles Mfrs. Assoc.*, 463 U.S. at 42.

Finally, the immigration judge appears to make a finding relating to the reasonableness of any fear of future persecution. The immigration judge, apparently relying entirely on several sentences in the State Department's Profile of Asylum Claims for Albania, stated that "there is *no indication*, based on current country conditions . . . *which[] would give the Court any concern* that the individuals would be persecuted. Specifically, the Profile[] simply does not support[] the [Petitioners'] contention." (J.A. at 67 (emphasis added).) The Profile is a cursory document consisting of five substantive pages. The INS also submitted a Country Report on Human Rights Practices for 1996 which provides a much more complete overview of the conditions in Albania during the key period. *See* S. Rep. 105-10 (1997). The Senate report notes that the May 1996 parliamentary elections in Albania were fraught with government sponsored "fraud, beatings[,] and intimidation." *Id.* at 813. The report also notes that "there were numerous allegations of police abuse before, during, and after the May elections." *Id.* The report goes on to state the "the [g]overnment's human rights record worsened during the year [1996]." *Id.* The report notes police beatings and killings. *Id.* This much more comprehensive information available to the immigration judge compels me to conclude that information about the Albanian regime *does exist* which both bolsters Petitioners' claims of persecution

in 1996 and contradicts the immigration judge's contention that there is nothing to give the judge *any* concern about any future persecution.

Based upon the lack of evidence underpinning *any* of the immigration judge's conclusions as reviewed above, I find that the immigration judge has failed to "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Assoc.*, 463 U.S. at 42. The immigration judge's failure to identify and reflect the basis for Petitioners' asylum claims – political opinion – despite the apparent nature of their claim, renders meaningful appellate review of the decision by this Court impossible. It is not the role of this Court to glean a substitute rationale from the record to support the BIA's final disposition of the case. *Id.* I would therefore remand for further consideration by the BIA. *See Sylla v. INS*, 388 F.3d 924, 930 (6th Cir. 2004).

### III.

### DUE PROCESS

**A.    Standard of Review**

This Court reviews *de novo* the question of alleged due process violations in removal hearings. *See Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). In reviewing alleged violations, this Court first asks whether there was a defect in the proceedings, and then asks whether the petitioner was prejudiced by the defect. *Id.*

**B.    Analysis**

Petitioners argue that they were denied due process in at least two ways. First, Petitioners allege that gaps in the hearing transcript, where responses and statements were

deemed inaudible, resulted in a record so incomplete as to deny them due process. Petitioners obviously fail to develop this argument on appeal because Petitioners do not represent what information is missing from the record in the inaudible sections. Petitioner Adriatik, however, also alleges that the BIA denied him due process when it decided Adriatik's asylum application was untimely filed without placing Adriatik on notice that it was pursuing such an avenue nor giving him an opportunity to respond.

The BIA did more than summarily affirm the immigration judge's order. While adopting the immigration judge's decision as its own, the BIA also supplemented the decision with its own commentary. Significantly, the BIA noted in a footnote that Adriatik had not demonstrated that his application was timely. The hearing before the immigration judge at no time addressed the timeliness of Adriatik's application, nor did an asylum officer conduct an interview with Adriatik to assess the timeliness of his application. The BIA's own regulations require notice and an opportunity to be heard on the issue of the timeliness of an application for asylum. *See* 8 C.F.R. § 208.4 ("If an applicant files an asylum application and it appears [untimely] . . . an asylum officer, in an interview, or an immigration judge, in a hearing, shall review the application *and give the applicant the opportunity to present any relevant and useful information* bearing on [timeliness] to determine if the application should be rejected.")

Fifth Amendment guarantees of due process extend to aliens in deportation proceedings. *Hamid v. Ashcroft*, 336 F.3d 465, 468 (6th Cir. 2003). In addition to the protections established by the Constitution, an alien's right to a full and fair hearing is also protected by specific statutory and regulatory provisions. *See, e.g.*, 8 U.S.C. sec. 1252(b),

8 C.F.R. § 208.4(a) (*supra*); 8 C.F.R. §. 242.16(a) (aliens must be provided reasonable opportunity to present testimony in their own behalf).  If the prejudice to the alien is sufficiently great, denial of the right to a full and fair hearing may violate the constitutional guarantee of due process.  *See Allabani v. Gonzales*, 402 F.3d 668, 676 (6th Cir. 2005). The BIA's failure to grant Adriatik an opportunity to contest a timeliness challenge therefore amounts to a due process violation.

It is significant to note that this Court would not exercise appellate jurisdiction over a BIA determination of timeliness.  Such an exercise would be contrary to law.  *See* 8 U.S.C. § 1158(a)(3) ("No court shall have jurisdiction to review any determination of the Attorney General [concerning the timeliness of an alien's application for asylum].").  In the instant case, Petitioner alleges that he was denied due process *en route* to the BIA's determination.  I agree.  "[A]s a matter of due process, assigning complete discretion to an agency to apply the law does not allow that decisionmaker to ignore the law."  *Gjyzi v. Ashcroft*, 386 F.3d 710 (6th Cir. 2004) (citing *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (holding that provision barring appellate judicial review of a determination concerning an immigration application did not foreclose "general collateral challenges to

unconstitutional practices and policies used by the agency in processing applications")).

"In other words, the specter of a due process violation is raised – and easily falls within our

jurisdiction –  where the agency ignores its own law." *Id.*  The BIA in this case ignored its

own legal requirements in failing to give Adriatik an opportunity to argue against a

determination of untimeliness.

In this case, the denial of asylum to Adriatik based on the timeliness of his asylum

application may be correct or incorrect, but at present, Adriatik has had no opportunity to

respond to that contention, pursuant to the BIA's own regulations on the subject.  Petitioner

Adriatik must be afforded an opportunity to be heard on the timeliness of his application.

## IV.

## CONCLUSION

Because I would find that the BIA's decision is not supported by substantial evidence

and that Petitioner Adriatik was denied due process by the BIA's timeliness determination,

I would vacate the order of the BIA and remand for further proceedings.

**RONALD LEE GILMAN, Circuit Judge, concurring**.  I join the lead opinion, but write separately to address two points made by the dissent.  First, the dissent relies heavily upon the assertion that "the immigration judge failed to recognize that Petitioners were seeking asylum on the basis of political opinion."  The BIA, however, addressed and rejected the Nazarkos' claim for asylum on that basis.  Specifically, the BIA found that "[i]t is not evident that [the incidents experienced by the Nazarkos] were motivated by [their] family status or political beliefs."  The dissent underweights the fact that the BIA considered and rejected this claim, and thereby makes too much of the fact that the IJ did not.  *See Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (reviewing the IJ decision directly, but considering the additional analysis performed by the BIA).

The dissent also attempts to explain away the inconsistencies in the Nazarkos' testimony about which political party was responsible for the various attacks.  Ivzi blamed the communists and the socialists for the attacks, while Adriatik blamed the Democratic Party.  The dissent notes that it performed "a careful reading of the complete record" and concludes that, because Ivzi also testified that "people who are claiming to be democrats are communists," there is really no inconsistency in the testimony at all.  Although this conclusion might withstand scrutiny if reached by the IJ himself or by this court on a de novo review, I do not believe that the standard of review applicable in this case permits such an attempt to reconcile the Nazarkos' conflicting testimony.  *See Klawitter v. I.N.S.*, 970 F.2d 149, 152 (6th Cir. 1992) ("[I]n order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed compels it.").  The IJ's finding of a material inconsistency on this key issue of

alleged politically motivated persecution, in other words, is not subject to second-guessing on appeal where, as here, the finding is supported by the record.

For these reasons, as well as for those set forth in the lead opinion, I concur in the decision to deny the petition for review.