**NOT RECOMMENDED FOR PUBLICATION**
File Name: 07a0017n.06
Filed: January 8, 2007

**No. 05-3520**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOSE ANTONIO GRIJALVA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON PETITION FOR REVIEW |
| | ) | FROM A FINAL ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION APPEALS |
| | ) | |
| ALBERTO R. GONZALES, | ) | |
| | ) | |
| Defendant-Appellee | ) | |

**BEFORE: DAUGHTREY and GIBBONS, Circuit Judges; EDMUNDS[*], District Judge**

**PER CURIAM.** Petitioner, Jose Antonio Grijalva, is a citizen of Guatemala who seeks review of a decision of the Board of Immigration Appeals (BIA) that affirmed an Immigration Judge's (IJ) denial of his claims for asylum under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(42)(A), and relief under the United Nations Convention Against Torture (CAT) and reversed, as clearly erroneous, the IJ's grant of his claim for withholding of removal under the INA. The BIA also found that Grijalva's due process arguments, based on alleged interpreter error, lacked merit.

Because substantial evidence supports the IJ's adverse credibility determination, Grijalva's petition for review of his claim for asylum is DENIED. Moreover, because Grijalva failed to show

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

that there was a defect in the removal proceedings that prejudiced his right to a full and fair hearing, his petition for review based on alleged due process violations is DENIED.

Grijalva's petition for review of his claims for a withholding of removal and relief under the CAT are GRANTED. Because the BIA applied an improper legal standard, one that required Grijalva to show a pattern and practice of persecution "adopted by the government," its decision denying Grijalva's claim for withholding of removal and affirming the IJ's denial of Grijalva's claim for relief under the CAT is VACATED and these claims are REMANDED to the BIA for a decision consistent with this opinion.

## I.    Facts and Procedural Background

Grijalva is a native and citizen of Guatemala who entered the United States through San Ysidro, California, on or about December 5, 1994. His claims for asylum, withholding of removal, and relief under the CAT arise from two conflicting asylum applications.

### A.    1995 Asylum Application

In October, 1995, Grijalva signed and filed an application for asylum. That 1995 application stated that he was afraid to go back to Guatemala because he was threatened by guerrilla groups that he refused to join. He did not report that he had been detained or interrogated in Guatemala, did not mention his sexual orientation, or that he was mistreated in Guatemala because he is a homosexual. Grijalva failed to appear at his asylum interview,[1] and his 1995 application for asylum was administratively closed.

### B.    1997 Asylum Application

---

[1]Grijalva testified that he did not receive notice for scheduled interviews on December 7, 1995 or June 19, 1996, but admitted that he did not provide the asylum office with his change of address.

On March 24, 1997, the former Immigration and Naturalization Service (INS) started deportation proceedings against Grijalva. An order to show cause was filed in immigration court, under former Section 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B) (1994), requiring Grijalva to show cause why he should not be deported for being an alien who entered the United States at a place other than that designated by the Attorney General. At the initial 1997 show cause hearings, Grijalva, who was represented by counsel, admitted the factual allegations against him, conceded that he was deportable as charged, but declined to designate a country of deportation and indicated that he would be seeking asylum.

Grijalva also filed a new asylum application on December 2, 1997, with the assistance of an attorney. The 1997 asylum application states that Grijalva had been persecuted and abused in Guatemala because of his membership in a particular social group -- obviously effeminate homosexual men -- and that the Guatemalan police had refused to protect him. Grijalva claims that he has been very effeminate from the time he was a small boy and, as a result, has been abused for most of his life. Because his father abandoned his mother when he was a child, and his stepfather did not want him in the house, Grijalva lived with his grandmother. Finding the abuse at school too much, Grijalva dropped out of school at an early age. He did not learn to read or write, other than to sign his name.

At age 18, Grijalva left his grandmother's home to work in a town about four hours away. He earned a living by selling fruit, fruit drinks, vegetables and other items in the market during the daylight hours to customers who were mostly female. Other male vendors at the market were also gay. He picked this work, hoping that it was safer for him as a homosexual. He never went outside at night.

3

At age 25, Grijalva tried to expand his business by selling grilled meats in the late afternoon and early evenings and on the weekends. During these expanded times, there were more male customers. Because he was obviously homosexual, they were hostile to him. Sometimes, one man or gangs of men would throw his cooking supplies and food to the ground or at him while yelling obscenities about his homosexuality. He was beaten at least three times. These attacks happened every two or three weeks for almost two years. Each time, Grijalva would complain to the police, but the police did nothing to protect him. Instead, the police cursed him and told him that it was his fault for being queer and doing women's work rather than men's work in the hills.

At age 27, Grijalva gave up selling grilled meats and returned to selling fruit during the day at the market. After about a year of this, another homosexual vendor falsely accused him of having a relationship with his lover and threatened to kill Grijalva or have others "do something" to him. Again, he reported this to the police. Again, they refused to help him, telling him that it was his fault because he was gay and should be working in the hills like a real man. Because of these most recent threats, Grijalva sold his business and hid in his rented room for about a year. After that, at about age 30, he returned to his grandmother's home.

After hiding at his grandmother's house for about three months, Grijalva went to Mexico, thinking it would be safer to find work there. He found work at a banana plantation, but the manager there cursed and threatened Grijalva for being queer. After about six months, the manager fired him, telling him that he only wanted "machos" working for him and not "faggots."

Finding Mexico no safer for homosexuals than Guatemala, Grijalva decided to return to his grandmother's home. On the return trip, the truck carrying him was stopped by Guatemalan guerrillas near Tecum Uman. They forced Grijalva and the other passengers off the truck by

gunpoint and made them all lie face down on the ground while they checked their papers. The guerrillas noticed Grijalva's long hair and effeminate manner, and threatened to rape him, saying "you look like a woman, you're good for us, we're going to use you as a woman." Grijalva was terrified, but the guerrillas did not take him with them. He returned to his grandmother's house, still frightened by the experience.

After about two months, he returned to Mexico and found work in another town packing bananas. He left Mexico about a year later, in 1990, when problems arose with the authorities because he had no papers and was working illegally. While traveling back to Guatemala, the truck he was traveling in was stopped near Escuintla by a group of Guatemalan soldiers. The soldiers demanded to see Grijalva's and everyone else's papers, ordered them all off the truck, and checked their luggage. When the soldiers opened Grijalva's pocketbook, they saw his makeup and skin creams. They saw that he was gay and ordered him to remain with them, letting all the other passengers and the truck to leave.

The soldiers forced Grijalva to go to their camp, telling him that he would enjoy what they were going to do to him. He begged them not to kill him. Grijalva was locked in a room for three days and nights and was gang raped, usually by four soldiers at a time. While raping him, the soldiers yelled obscenities about Grijalva being a homosexual. He thinks he was raped about two or three times a day by about 30 soldiers. He was in great pain, humiliated, and felt like a prostitute for these men.

At about 10:00 p.m. on the third night, the soldiers pulled him out of the room and dumped him in the road, wearing only his underpants. They also threw his clothes in the road. After he put his clothes on, he got a ride into Escuintla and then to his grandmother's home in La Danta. He did

5

not report the rape to the police because the soldiers told him they would kill him if he did. He was also afraid that the police were on the same side as the soldiers and that he would be killed if he reported the rape. After the rape, Grijalva had nightmares and was anxious.

For about four years, he remained inside his grandmother's home as much as possible, supporting them by selling food he had cooked to neighbors.

In 1994, Grijalva decided that he would escape to the United States because his grandmother was getting old and could not protect him much longer.

In November 1994, he left Guatemala, traveled through Mexico for about a month, and arrived in the United States in early December 1994. Since that time, he has lived in the United States without the fear of being killed because he is an effeminate homosexual. According to his 1997 asylum application, Grijalva believes that if he returns to Guatemala, he will be tortured, raped, and perhaps murdered because he is an effeminate homosexual, and that the police will not protect him for that reason. Grijalva wants asylum because he cannot change who he is and wants to live without fear of being detained, beaten, gang raped and murdered because he is a homosexual.

## C.    Show Cause Hearing and IJ Decision

On several dates in 1997 and 1998 and in 2003, proceedings were held on the Immigration Court's order to show cause why Grijalva, who was 47 years old in 2003, should not be deported to Guatemala. The IJ issued an oral decision and written order on August 13, 2003. Observing that Grijalva's testimony was crucial, the IJ found that he was not a credible witness and thus denied his claims for asylum and relief under the CAT.

The IJ first observed that there were inconsistencies in his 1995 and 1997 asylum applications. The 1995 application, that Grijalva signed and submitted to the INS, did not mention

6

the basis for his 1997 asylum application – that the Guatemalan police failed to protect him from threats and abuse and that he was raped by the Guatemalan military because he is a homosexual. The IJ acknowledged Grijalva's argument that this inconsistency was caused by a notario who took advantage of him rather than his own fabrication of the truth. Nevertheless, the IJ found inconsistencies attributable to him personally, rather than activities of the notario. For example, Grijalva testified that the gang rape by the Guatemalan soldiers occurred in 1994, but his 1997 asylum application stated that the gang rape occurred in 1990. Grijalva also told Dr. Zender, who diagnosed him with post-traumatic stress disorder, that the gang rape had occurred in 1990. The IJ found this four-year discrepancy to be significant and not sufficiently resolved by evidence of the cultural norm in Guatemala to use life events rather than calendar dates to explain when an event has occurred. The gang rape itself was the sort of life event that would likely be used to mark the passage of time.

The IJ was convinced that Grijalva is an effeminate homosexual and observed that homosexuality had been recognized as a "particular social group" under the BIA's decision in *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822-23 (BIA 1990). Because he found that Grijalva lacked credibility, however, the IJ was not convinced that Grijalva had been the subject of a gang rape or past persecution in Guatemala because of his sexual orientation. The IJ also determined that, because of Grijalva's lack of credibility, his application for asylum did not merit a favorable exercise of discretion. Accordingly, the IJ denied Grijalva's application for asylum.

The IJ also denied Grijalva's application for relief under the Convention Against Torture. Although there was evidence that the Guatemalan government had turned a deliberate blind eye to the mistreatment of homosexuals in the past, the IJ was not convinced that Grijalva would be

7

subjected to government-sponsored torture, as opposed to mere persecution, if he returned to Guatemala.

Despite these rulings, the IJ determined that Grijalva had established that it would be more likely than not that he would be persecuted, as opposed to tortured, if he returned to Guatemala and thus granted his application for a withholding of removal. The IJ's decision relied heavily on declarations in Andrew Reding's July 30, 2003 affidavit, that Guatemala had become a "killing zone" for effeminate homosexuals.

Both Grijalva and the Department of Homeland Security (DHS) filed timely appeals with the BIA.

### D.      Appeals and BIA Decision

On appeal, Grijalva argued that (1) the IJ erred in his adverse credibility determination and the denial of his application for asylum and relief under the CAT; and (2) he was denied due process as a result of inadequate translation at the deportation hearing. The DHS argued that the IJ erred in granting Grijalva's application for withholding of deportation as he had not established that it was more likely than not that he would be subject to persecution in Guatemala because of his homosexuality.

The BIA first addressed Grijalva's credibility argument. It found that the IJ's adverse credibility determination was not clearly erroneous and that the inconsistencies as to when the gang rape occurred, "go to the heart of [Grijalva]'s claim as they relate to whether he had been persecuted on account of his sexual preference." The BIA thus affirmed the IJ's denial of asylum.

The BIA next considered the IJ's determination that Grijalva was eligible for withholding of deportation and found it to be clearly erroneous. To qualify for such relief, an alien must:

8

> show a clear probability of persecution in the country designated for deportation. *See INS v. Stevic*, 467 U.S. 407 (1984); 8 C.F.R. § 1208.16. This means that the alien must establish that it is more likely than not that he would be subject to persecution in the country designated for deportation. If an alien establishes that he suffered past persecution, it is presumed that his life or freedom would be threatened in the future in the country of removal on the basis of the original claim, absent a showing of a fundamental change in circumstances or the ability to relocate internally. *See* 8 C.F.R. § 1208.16(b).

Joint Appendix ("JA") at 76 (BIA Order at 3). Reviewing the record, the BIA did not find sufficient evidence to conclude that it was more likely than not that Grijalva would be persecuted if he was deported to Guatemala. Because the IJ had found that Grijalva failed to show past persecution because of his homosexuality, he was not entitled to a presumption that his life would be threatened in the future for that reason. Thus, the BIA examined the evidence the IJ relied upon in granting Grijalva's withholding of deportation. It observed that the IJ relied "in significant part" upon a July 30, 2003 affidavit by Andrew Reding. The BIA found the Reding affidavit to be insufficient to "show a pattern and practice adopted by the government towards homosexuals." BIA Order at 4 (emphasis added). Accordingly, the BIA concluded that the IJ had erred in granting Grijalva's application for withholding of deportation.

Finally, the BIA addressed and rejected Grijalva's due process arguments as meritless. It found that: (1) the interpreter errors were insignificant; (2) Grijalva failed to establish that the IJ's decision was based on interpreter errors or that he was prejudiced; (3) Grijalva was represented by counsel who did not request a different interpreter; and (4) there was no evidence of bias on the part of the IJ.

## II.     Jurisdiction and Standard of Review

9

This Court has jurisdiction to review Grijalva's timely appeal of the BIA's final order of removal under Section 242 of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1252(a)(1), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 310-11 (2005). The Court's review is limited to "the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A).

"Because the BIA issued its own opinion rather than a summary affirmance or adoption of the IJ's findings, this court reviews the BIA opinion as the final agency determination." *Xhamxhi v. Gonzales*, No. 05-3952, 2006 WL 2873390, *3 (6th Cir. Oct. 5, 2006) (citing *Zaitona v. INS*, 9 F.3d 432, 434 (6th Cir. 1993)). Questions of law are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). Credibility determinations are findings of fact reviewed under the substantial evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). This is a highly deferential standard of review, requiring that "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). The standard set forth in § 1252(b)(4)(B) "basically codifies the Supreme Court's substantial evidence standard." *Id.* Although highly deferential, "the determination must be supported by specific reasons, must not be based on irrelevant inconsistencies, and must be based on issues that 'go to the heart of' the applicant's claim." *Xhamxhi*, 2006 WL 2873390 at *3 (quoting *Sylla*, 388 F.3d at 926). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

III. **Analysis**

Grijalva's claim for asylum is based on his alleged past persecution and fear of future persecution in Guatemala for being an obviously effeminate homosexual. His petition argues that (1) the BIA erred when it upheld the IJ's finding that he lacked credibility and thus denied his application for asylum and relief under the CAT, (2) the BIA erred when it reversed the IJ's grant of his request for withholding of removal, and (3) he was denied due process at his immigration proceedings because of interpreter error and misconduct by opposing counsel. We first address the denial of Grijalva's application for asylum based on the finding that he lacked credibility.

## A.       Claim for Asylum

### 1.       Legal Standard

Requests for asylum require a two-step inquiry: "(1) whether the applicant qualifies as a refugee as defined in [8 U.S.C.] § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citation and quotation marks omitted). A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). It is the applicant's burden to establish that he qualifies as a refugee "'either because he . . . has suffered past persecution or because he . . . has a well-founded fear of future persecution.'" *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting 8 C.F.R. § 208.13(b)).

11

If the applicant fails to show that he suffered past persecution, he does not obtain the benefit of the presumption under 8 C.F.R. § 208.13(b)(1)(i) of a well-founded fear of suffering future persecution and "retain[s] the burden of proof on that issue." *Mikhailevitch*, 146 F.3d at 390. That burden requires that the asylum applicant show:

> that "persecution is a reasonable possibility" should he be returned to his country of origin. A well-founded fear of persecution has both a subjective and an objective component: an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an "objective situation" under which his fear can be deemed reasonable. A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."

*Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31, 440 (1987)). "Because a well-founded fear of persecution can be based upon what has happened to others who are similarly situated, it is 'necessary, in considering an applicant's asylum petition, to weigh evidence of general conditions in the country of origin and the foreign government's history of treatment of others engaged in similar activities.'" *Ali*, 366 F.3d at 411 (quoting *Perkovic*, 33 F.3d at 621).

### 2. Adverse Credibility Determination

The BIA did not err in upholding the IJ's adverse credibility determination. Despite Grijalva's arguments to the contrary, substantial evidence supports the finding that Grijalva was not credible. First, the gang rape reported in his 1997 asylum application was never mentioned in the 1995 asylum application. Grijalva's argument, that the 1995 application has no probative value because it was prepared by a notario and signed by Grijalva, who cannot read, lacks merit. It ignores Grijalva's testimony that a friend read him the contents of the 1995 application and that he signed

12

it knowing that it did not say anything about his homosexuality or the alleged gang rape by Guatemalan soldiers.

Second, Grijalva's testimony about the gang rape by Guatemalan soldiers was inconsistent with his 1997 asylum application and with what he reportedly told his clinical psychologist, Dr. Zenger. In both, Grijalva reported that the gang rape occurred in 1990; four years before he escaped to the United States. His direct testimony at the immigration proceedings was significantly different; that he escaped to the United States only a few months after the gang rape. Grijalva's reliance on *Ileana v. INS*, 106 F. App'x 349, 354 (6th Cir. 2004), is misplaced. Unlike in *Ileana*, the inconsistencies the IJ and BIA relied upon were not inconsequential or dubious, and, because he was represented by counsel, there was less reason for Grijalva to feel nervous, intimidated, or confused.

Finally, despite Grijalva's claims to the contrary, the inconsistencies relied upon by the BIA go to the heart of Grijalva's claim that he was persecuted in Guatemala for being an effeminate homosexual and can be viewed as attempts by him to enhance his claims of persecution. Inconsistencies about how long Grijalva remained in Guatemala after his alleged gang rape -- four years or a few months -- reasonably give rise to the question why he would remain in Guatemala for four years if he lived in constant fear of similar abuse as well as the suggestion that the gang rape might never have occurred.

These inconsistencies are sufficient to support the BIA's adverse credibility determination. Thus, there is no need to address Grijalva's additional arguments about other inconsistencies. *See Xhamxhi*, 2006 WL 2873390 at *4 (observing that "[o]ther circuits hold that a single inconsistency may support an adverse credibility finding.").

3.      **Whether Grijalva Merited A Favorable Exercise of Discretion**

13

Although the IJ did not make a finding whether Grijalva established a well-founded fear of persecution, thus allowing him to be defined as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), the IJ did consider his corroborating evidence of future persecution. Despite that consideration, the IJ found that, because of his lack of credibility, Grijalva did not merit a favorable exercise of discretion by the Attorney General. The IJ has the authority to do so even when there is a finding that the applicant qualifies as a refugee. *See* 8 C.F.R. § 208.14(a) (providing that an immigration judge may "deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act."). It was not clear error to find that Grijalva's lack of credibility doomed his claim for asylum. *Dia v. Ashcroft*, 353 F.3d 228, 247 (6th Cir. 2003) (observing that "[a]n alien's credibility, by itself, may satisfy his burden, or doom his claim [for asylum]."). Grijalva concedes that a grant of asylum is discretionary.

## B.     Claims For Withholding of Removal and Protection Under the CAT

Although the IJ did not make a finding whether Grijalva had established a well-founded fear of persecution so as to satisfy the statutory definition of a "refugee," the IJ did find that Grijalva satisfied the higher burden for a withholding of removal by establishing that it would be more likely than not that he would be persecuted if he returned to Guatemala. The BIA reversed this determination because it did "not find substantial evidence to conclude that it is more likely than not that [Grijalva] would be persecuted in Guatemala on account of his homosexuality." The BIA based this finding on its application of a legal standard requiring that Grijalva show a pattern and practice of persecution "adopted by the government" of Guatemala and its examination of the July 30, 2003 Andrew Reding affidavit that the IJ relied upon in its grant of Grijalva's request for withholding of removal.

14

Andrew Reding's affidavit avers that: (1) he is a Senior Fellow for Hemispheric Affairs at the World Policy Institute, New School University, New York, New York; (2) he was currently completing a report on *Treatment of Lesbian, Gay, Bisexual, and Transgendered Persons in Latin American and the Caribbean* for the Department of Homeland Security; (3) some of the findings that were to be stated in that report were summarized in his affidavit; (4) "[t]he situation for homosexuals in Guatemala, and particularly for those with effeminate tendencies, has worsened since the publication of the INS Resource Information Center report"; (5) that "Guatemala has become a 'killing zone' for such individuals", (6) that "[o]penly identified homosexuals are ending up dead on the streets as the deliberate victims of 'social cleansing' campaigns", (7) "[i]t is widely believed that vigilante groups that engage in the 'social cleansing' of homosexuals are comprised of former members of the state counterinsurgency network", (8) "[t]he Guatemalan government has turned a deliberate blind eye to the activities of vigilantes who conduct 'social cleansing' campaigns against homosexuals", (9) "[h]omosexuals are widely reviled among the Guatemalan public, and the Guatemalan government has no incentive or desire to bring the murderers to justice", (10) with the exception of one instance related to the murder of a United States citizen, journalist Larry Lee, "the government has not investigated or prosecuted any of the cases in which a homosexual has been murdered," (11) "[t]here are no opportunities for internal relocation in Guatemala for a homosexual, particularly one with effeminate tendencies", (12) "such an individual would be discriminated against and would be subject to violence and possible execution no matter where he lived in that country", and (13) based on his studies of the area, "Guatemala would be one of the most difficult places for a homosexual to survive."

The BIA found that, although the Reding affidavit made general assertions about the mistreatment of homosexuals, Reding "fail[ed] to corroborate his statements or provide specific data to show a pattern and practice of persecution of homosexuals in Guatemala." The BIA further observed that, although Grijalva presented evidence of "societal prejudice and isolated incidents of violence directed towards homosexuals in Guatemala", this evidence did "not show a pattern and practice adopted by the government towards homosexuals." (Emphasis added). The BIA thus reversed the IJ's decision to grant Grijalva's request for a withholding of removal to Guatemala.

Grijalva argues here that the BIA's reversal was in error because it applied the wrong legal standard. Accordingly, we first set out the proper legal standard for a withholding of removal and then examine whether the BIA properly applied that standard.

1.      **Legal Standard**

While there is discretion to grant asylum, "withholding of removal is mandatory if an alien can show that his life or freedom would be threatened" because he is a member of a "particular social group." *Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005) (citing 8 U.S.C. §§ 1101(a)(42)(A) and 1231(b)(3)(A)). "To qualify for withholding of deportation, an applicant must show a 'clear probability of persecution,' which is a stricter standard that the 'well-founded fear' standard that applies with respect to applications for asylum." *Ali*, 366 F.3d at 411 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984) and 8 C.F.R. § 208.16(b)(1)). "'Persecution' entails 'punishment or the infliction of suffering or harm,' but 'harassment or discrimination without more does not rise to the level of persecution.'" *Ali*, 366 F.3d at 410 (quoting *Mikhailevitch*, 146 F.3d at 389-90). Moreover, "if the government itself is not responsible for the persecution," it must be shown that the government "is

16

unable or unwilling to control the group responsible." *Patel v. INS*, 22 F. App'x 478, 480 (6th Cir. 2001) (per curiam) (citing *Singh v. INS*, 134 F.3d 962, 967 n.9 (9th Cir. 1998)).

"We review the BIA's decision on a request for withholding of removal under the same standard regardless of whether the request was made pursuant to the INA or the CAT. . . . We will reverse the BIA's determination against withholding of removal if it is 'manifestly contrary to law.'" *Almuhtaseb v Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(C)).

### 2.     BIA Applied Improper Legal Standard

Reding attested in his affidavit that the Guatemalan government has turned a deliberate blind eye toward vigilantes who conduct social cleansing campaigns against homosexuals in that country and has no incentive or desire to bring them to justice as evidenced by their failure to do so in all but one instance that involved a journalist and United States citizen. Reding's affidavit is consistent with earlier statements in a United States State Department letter addressed to the IJ and contained in the record. Based on its analysis of conditions in Guatemala, the State Department reported that the Guatemalan police reflect that country's cultural bias against homosexuals, including those who may be victims of police harassment and extortion.

The BIA concluded that, because Grijalva had not shown a pattern and practice "adopted by the government" towards homosexuals, Grijalva could not establish that it was more likely than not that he would be persecuted in Guatemala because he is a homosexual. That is an improper legal standard. It ignores the decision in *Patel* where this Court observed that  "if the government itself is not responsible for the persecution," the applicant may show that the government "is unable or unwilling to control the group responsible." *Patel*, 22 F. App'x at 480 (citing *Singh*, 134 F.3d at 967

17

n.9).  It likewise fails to credit the observations in the Reding affidavit and the State Department letter that the Guatemalan government turns a blind eye toward the persecution of homosexuals in that country.  Accordingly, because the BIA applied the incorrect legal standard, we vacate its decision as to Grijalva's claim for withholding of removal and remand this matter to the BIA for a decision consistent with this opinion.[2]

### 3.	Relief Under the Convention Against Torture (CAT)

Grijalva also argues that he satisfied his burden of showing that it was more likely than not that he would be tortured if he was deported to Guatemala and is thus entitled to relief under the CAT.  *See* 8 C.F.R. § 208.16(c)(2) (placing the burden on an applicant seeking relief under the CAT to prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal").  "Protection under the CAT is given in the form of withholding of removal." *Namo*, 401 F.3d at 457.  "An applicant must show that if he is returned to his country of origin, he would be subjected to an act of torture, as defined in 8 C.F.R. § 208.18(a)." *Id*. (citing 8 C.F.R. § 208.16(c)(1)).  Torture, so defined, requires that it be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 208.18(a)(1).  This Court recently clarified that "willful blindness" falls "within the definition of "acquiescence." *Amir v. Gonzales*, 467 F.3d 921, 927(6th Cir. 2006).  The BIA erred when it failed to consider this definition of "acquiescence" in light of averments in the Reding affidavit and the statements in the earlier State Department letter that the Guatemalan police turn a deliberate blind eye toward the persecution of homosexuals in that country.  Accordingly, we vacate the BIA's

---

[2]Reding's Report for the Department of Homeland Security is now available and thus may supply additional support for the relief Grijalva seeks.

18

decision affirming the denial of Grijavla's claim for protection under the CAT and remand this matter to the BIA for a decision consistent with this opinion.

### C.    Due Process Claims

Finally, Grijalva argues that he was denied due process and a full and fair hearing because of interpreter error and government counsel's alleged misconduct. The BIA found Grijalva's due process arguments to be without merit. It concluded that the interpreter's errors cited on appeal were insignificant, that Grijalva had failed to show that the IJ's decision relied on any incorrect interpretation, and that Grijalva failed to show that he was prejudiced. It observed that Grijalva was represented by counsel, and his counsel did not request a different interpreter. Grijalva apparently did not raise his arguments about government counsel's conduct with the BIA.

### 1.    Standard of Review and Legal Standard

"We review de novo alleged due process violations in removal hearings." *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). To the extent Grijalva's arguments are based on a February 27, 2006 affidavit of David Garcia, a translator recently hired by Grijalva, they cannot be considered in connection with this appeal. This Court must decide Grijalva's petition for review only on the administrative record. 8 U.S.C. § 1252(b)(4)(A). *See also Bejjani v. INS*, 271 F.3d 670, 676 (6th Cir. 2001) (observing that the "Court is prohibited from considering facts not in the administrative record.").

Aliens in removal proceedings are entitled to the due process guarantees of the Fifth Amendment, including a full and fair hearing. *Id.* "To constitute fundamental unfairness, however, a defect must have been such as might have led to a denial of justice." *Id*. (internal quote and citation omitted). Proof of prejudice is required. *Id.* "A showing of prejudice is essentially a

19

demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (internal quote and citation omitted). The Court thus reviews whether (1) "there was a defect in the removal proceeding;" and (2) "the alien was prejudiced because of it." *Vasha*, 410 F.3d at 872.

### 2. Interpreter Error

The interpreter errors Grijalva points out are minor, insignificant, and do not go to the heart of his asylum claims. The adverse credibility determination rested principally on Grijalva's testimony (1) that he signed his 1995 asylum application after it was read to him, knowing that it did not state that he was a homosexual or that he had been gang raped by Guatemalan soldiers because he was a homosexual or that he was seeking asylum in the United States to escape the threat of harm because of his homosexuality; and (2) that he left Guatemala a few months after the gang rape as opposed to the four year time-period he provided in his 1997 asylum application and in his conversations with Dr. Zenger. It also rested on Grijalva's changing testimony and demeanor when asked whether it was his signature on the 1995 asylum application. It was ultimately determined that it was his signature. Thus, any interpreter errors as to whether he signed before or after the document was prepared are insignificant and cannot establish prejudice. Additional interpreter errors cited by Grijalva are similarly insignificant and cannot establish prejudice. Moreover, as the BIA observed, Grijalva was represented by counsel during his immigration proceedings, and his counsel did not request a different interpreter. Grijalva complained of prejudicial interpreter error for the first time in his administrative appeal to the BIA. *See Gishta*, 404 F.3d at 978-79 (denying a due process argument based on interpreter error because the issue was raised "for the first time in their

20

administrative appeal."). The BIA did not err when it determined that the interpreter errors Grijalva cites are insignificant and do not establish the requisite prejudice.

### b. Alleged Misconduct by Government Counsel and Judicial Bias

Grijalva further claims that he was denied a full and fair hearing because the IJ allowed opposing counsel to badger him, to repeatedly ask questions that he had already answered, to raise too many objections, to misrepresent his testimony on cross-examination, to make inappropriate comments about his time being wasted and thus allowed opposing counsel to prejudice the IJ against Grijalva. It is not enough to point to alleged defects in his removal proceedings. Grijalva must show that he was "prejudiced because of it." *Vasha*, 410 F.3d at 872. This Court has consistently observed that, although "the IJ is afforded broad discretion to control the manner of interrogation in order to ascertain the truth," the IJ must remain neutral as this "is one of the most basic due process protections." *Id.* (internal quotes and citations omitted). Grijalva has not shown that the IJ "crossed the line from impartial arbiter to government advocate." *Id.* at 873. The IJ overruled the vast majority of government counsel's objections, and granted Grijalva's request for a withholding of removal. The finding that Grijalva lacked credibility was based on substantial evidence, not interpreter error, government counsel's misconduct, or judicial bias.

## V. Conclusion

For the foregoing reasons, the BIA's decision is AFFIRMED and Grijalva's petition for review is DENIED as to his claims for asylum. The BIA's decision is AFFIRMED and Grijalva's petition for review is DENIED as to his due process claims.

21

Grijalva's petition for review as to his claims for a withholding of removal and protection under the CAT are GRANTED, and the BIA's decision as to these claims is VACATED. These claims are REMANDED to the BIA for a decision consistent with this opinion.